

U.S. Department of Justice

*United States Attorney*
*District of Maryland*

Mary Setzer
Assistant United States Attorney
Mary.Setzer@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4803
MAIN: 410-209-4800
FAX: 410-962-3091

March 25, 2021

Steven A. Allen, Esq.
Aidan Smith, Esq.
901 Dulaney Valley Road, Suite 500
Towson, Maryland 21204

*Via email:*
sallen@pklaw.com
asmith@pklaw.com



Re:   *United States v. Charles J. Nabit;* GLR-21-38

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, **Charles J. Nabit** (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If this offer has not been accepted by **April 5, 2021**, it will be deemed withdrawn. If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. The terms of the Agreement are as follows:

### Offense of Conviction

1.  The Defendant agrees to waive indictment and plead guilty to Count One of a single Count Information, charging the Defendant with Transportation of an Individual to Engage in Prostitution, in violation of 18 U.S.C. § 2421. The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.  The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    a.   That on or about the date(s) listed in the Information, in Maryland and elsewhere, the Defendant knowingly transported any individual in interstate or foreign commerce or in any territory or possession of the United States; and

b. The Defendant transported the individual with the intent that the person would engage in prostitution or illegal sexual activity.

### Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | MAX SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 2421(a) | None | 10 years | 3 years | $250,000 | $5,100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 2259, 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant

authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Sex Offender Registration

4.     This Office and the Defendant agree that, based on his forthcoming guilty plea and the stipulated facts in this case, the Defendant is not required to register as a sex offender pursuant to the Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20911. However, the Defendant understands and acknowledges that the legal determination about whether the Defendant is required to register as a sex offender under SORNA is a judicial one that will be made by the Court, and that the agreement of this Office and the Defendant concerning the interpretation of SORNA is not binding on the Court. The Defendant further understands and acknowledges that he is subject to state and local law of any jurisdiction where he may reside or work, and that the sex offender registration requirements of any state or local jurisdiction may be different than federal law under SORNA. Accordingly, the Defendant understands and acknowledges that it is his responsibility to register as a sex offender if the laws of the state or local jurisdiction where he may reside or work require him to do so and that failure to do so could subject him to penalties or criminal charges from the governing jurisdiction.

## Waiver of Rights

5.     The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.     The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against him. By agreeing to proceed by way of Information, he is giving up that right, and understands that the charges will be filed by the United States Attorney without the involvement of the Grand Jury.

b.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

c.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

d.     If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront

3

and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

  e. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

  f. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

  g. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

  h. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

  i. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28

U.S.C.§§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

7.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, as previously negotiated and agreed upon, and signed by the Defendant on February 24, 2021. Attachment A is incorporated by reference as part of this agreement herein.

### Group 1
### Count One
### (Transportation of an Individual to Engage in Prostitution)

a.  This Office and the Defendant agree that the base offense level is **14**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2G1.1(a)(2).

b.  This Office and the Defendant agree that there is a **two-level increase**, pursuant to U.S.S.G. § 3A1.1(b), because the Defendant knew or should have known that the victim of the offense was a vulnerable victim.

c.  Relevant Conduct: This Office and the Defendant further agree that pursuant to U.S.S.G. § 1B1.2(c), the Defendant's relevant conduct set forth in the stipulated factual basis constitutes Use of Interstate Facilities to Promote a Business Enterprise Involving Prostitution Business, in violation of 18 U.S.C. § 1952, and that each offense constitutes a separate group.

d.  The Subtotal for Group 1 is **16**.

### Group 2
### (Use of Interstate Facilities to Promote a Business Enterprise Involving Prostitution Business)

e.  This Office and the Defendant agree that the base offense level is **6**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2E1.2(a).

f.  This Office and the Defendant agree that there is a **two-level increase**, pursuant to U.S.S.G. § 3A1.1(b), because the Defendant knew or should have known that the victims of the offense were vulnerable victims.

g.  The Subtotal for Group 2 is **8**.

### Grouping Calculation

h.  Combined Offense Level: Pursuant to U.S.S.G. §3D1.4(a), there is no increase in offense level because Group 2 counts as one-half unit because the Group is between 5-8 levels less

5

serious than the Group with the highest offense level (Group 1). Thus, the combined offense level is **16**.

i. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

j. Anticipated Adjusted Offense Level: Thus, the parties agree that, should the Defendant receive the anticipated three-level reduction for acceptance of responsibility, the final adjusted offense level will be **13**.

8. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

9. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

10. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, including period of incarceration, supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including the conduct that is the subject of any count of the Information. *See* 18 U.S.C. §3661. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Restitution

11. The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant specifically agrees that this agreement and this paragraph covers

6

and applies to *all* of the victims identified in the Statement of Facts. The restitution could include the medical bills, as well as counseling costs (including travel) for any of the victims related to the incident, if any such costs exist or are reasonably projected. 18 U.S.C. §§ 3663, 3663A, 3563(b)(2), and 3583(d). The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement. The Defendant understands that an unanticipated amount of a restitution order will not serve as grounds to withdraw the Defendant's guilty plea.

## No Contact with Victims

12.   While incarcerated and throughout the entire term of his imprisonment, the Defendant will not make any contact, directly or indirectly, with any of the victims, as identified in the attached Statement of Facts or indicated in the discovery provided in the course of this case. The Defendant agrees to the entry of any Protective Order regarding any contact with any victim who may seek one. The Defendant specifically agrees that this provision shall continue following his release and will be part of any supervised release conditions ordered by the Court at the time of sentencing. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement. The Defendant waives and agrees to waive any right to challenge any prosecution based on the statute of limitations or double jeopardy and knowingly and voluntarily agrees to toll the limitations period through the end of his incarceration and supervised release.

## Waiver of Appeal

13.   In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.   The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

b.   The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment

of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except the Defendant reserves the right to appeal any sentence that exceeds the statutory maximum, except as follows:

    i. If the Court in this case determines that the Defendant is required to register as a sex offender pursuant to the federal Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20911, the Defendant reserves the limited right to appeal the determination that he is required under federal law to register as a sex offender.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Abandonment of Property

14. The Defendant agrees to abandon, and does hereby abandon, property obtained as a result of and used in furtherance of his criminal conduct, specifically the devices listed below. Further, the Defendant consents to the destruction of said devices:

    a. SanDisk model Ultra MicroSD flash memory card bearing number 9166XR7320WS;

    b. SanDisk model Evo Select MicroSD flash memory card bearing number KNGPK3KAD915;

    c. GoPro model Hero 7 Black digital video camera bearing serial number C3281327290619;

    d. GoPro model Hero 5 Session digital video camera bearing serial number C3211334714965;

    e. GoPro model Hero 5 Session digital video camera bearing serial number C3141326578922;

    f. GoPro model Hero 5 Session digital video camera bearing serial number C3141326053500;

    g. SanDisk model Extreme MicroSD flash memory card bearing no visible number;

    h. Apple iPhone 11 Pro Max cellular phone bearing IMEI number 353902106039175;

    i. Apple iPad Pro 4th Generation digital tablet device bearing IMEI number 352782117462520;

8

j.  HP model Z240 desktop computer with serial number 2UA7452YR9;

k.  'MUVI' model Veho Micro digital video camera bearing serial number 058F63776374;

l.  GoPro model Hero 7 Black digital video camera bearing serial number C3281326476089.

## Defendant's Conduct Prior to Sentencing and Breach

15. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

16. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement.

## Court Not a Party

17. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

18. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

By: *Mary W. Setzer*
Mary W. Setzer
Daniel A. Loveland, Jr.
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

3-26-2021
Date

Charles Nabit

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

3/29/21
Date

Steven A. Allen, Esq.
Aidan Smith, Esq.

# ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The defendant, Charles "Chuck" John Nabit, born in 1955, owns and resides at residences in Baltimore, Maryland, Bethany Beach, Delaware, and Deerfield Beach, Florida. Beginning no later than 2017 and continuing through his arrest on June 10, 2020, the defendant regularly paid for commercial sex with numerous women whom he knew to have either regularly used narcotics and/or to be severely addicted to narcotics.

The defendant is the owner of the Westport Group, LLC, located at 20 Commerce Street in Baltimore, Maryland (his business "office"). The defendant regularly engaged in commercial sex with victims at his business office, where he filmed many of the sexual encounters using multiple Go Pro cameras, regardless of the victims' protestations.

The defendant was a previous owner of the Mountain Manor Treatment Center, located at 3800 Frederick Avenue, Baltimore, Maryland. The Maryland Treatment Center, also known as Mountain Manor Treatment Center, is a comprehensive drug treatment center servicing the mid-Atlantic region.

Victim 1, Victim 2, Victim 3, Victim 4, Victim 5, Victim 6, and Victim 7 were women over the age of 18 and residents of Maryland, who each either regularly used narcotics and/or suffered from serious substance abuse disorders during the time periods that the Defendant was seeing them for commercial sex.

From in or about August 2018 through May 2020, the defendant paid or attempted to pay at least $90,000 via Cash App, as well as an unknown amount of cash, to women with whom he had commercial sex, a substantial portion of which was paid in exchange for the commercial sex. This includes 52 Cash App transactions to an individual whom he knew to be someone other than the particular women whom he was seeing for commercial sex, including Victim 1, Victim 2, Victim 3, and Victim 4, in connection with the commercial sex with these victims. For example, on or about April 11, 2019, Nabit received a message from the Cash App account associated with an adult male named De'Angelo Johnson, requesting $140 from the defendant "for coming thru on good girl n a hot girl" and the defendant paid $145 directly to this account with a message indicating the payment was "for:" "[first name of Victim 1]." Before paying the $145 to this account, Victim 1 herself requested payment directly from the defendant, sending a message to his Cash App account. The defendant "refused" payment directly to Victim 1, and 4 minutes later paid the $145 directly to the Cash App account associated with Johnson. Cash App records show "Bill_Getter_Refused" when the person receiving the request for money declines the request, and "Paid_Out" when the requested payer makes the payment.

Cash App is an instrumentality of interstate and foreign commerce which is a finance app allowing one to send and receive money with anyone else who also has a Cash App account. Cash App allows users to send a brief message in conjunction with a request for or payment of money, presumably to describe what the payment is for.

The defendant engaged in commercial sex with Victim 1 and Victim 3 at his office on several occasions in the Spring of 2019. The defendant filmed the commercial sex acts with Victim 1 and Victim 3 using a Go Pro camera. Victim 1 expressed concern with the defendant about his filming her.

The defendant began seeing Victim 2 and Victim 4 for commercial sex at a time unknown, but no later than 2018. This occurred at clubs in Baltimore, in hotels, and at the defendant's office. The defendant knew about Victim 2 and Victim 4's drug use.

Beginning at a time unknown, but in approximately 2019, the defendant began to engage in commercial sex with Victim 5. At times, the defendant either drove Victim 5 to his office, or he paid for her to get an Uber to his office, in order to engage in commercial sex with her. The defendant paid Victim 5 via Cash App, Venmo, PayPal, and Walmart to Walmart. Victim 5 discussed her struggles with drug addiction, and depression with the defendant. The defendant knew that it was likely that at least some of the money that he provided Victim 5 was being used to buy drugs in support of her addiction. The defendant filmed the commercial sex acts with Victim 5 with a Go Pro camera, despite Victim 5 expressing to the defendant that she was uncomfortable with being filmed.

Beginning at a time unknown, but no later than February 2019, the defendant began regularly seeing Victim 6 (A.N. in Count One of the Criminal Information) for commercial sex. The defendant paid Victim 6 for commercial sex via cash and via Cash App. Victim 6 discussed her drug use with the defendant on several occasions. The defendant provided Victim 6 with cocaine on multiple occasions when they saw one another for commercial sex, to include in his office and in Florida. On July 29, 2019, the defendant paid $5,000 to Victim 6 for her to travel to Fort Lauderdale Florida with him to engage in commercial sex. During that trip, the defendant provided Victim 6 with cocaine. Southwest records reveal that on July 29, 2019, the defendant and Victim 6 both flew from Baltimore Washington International Airport to Fort Lauderdale-Hollywood International Airport on flight #5878. The defendant engaged in commercial sex with Victim 6 during that trip to Fort Lauderdale.

The defendant also engaged in commercial sex with Victim 6 in Richmond, Virginia at the Westin Hotel on at least three separate occasions. On at least one occasion, the defendant drove Victim 6 from Baltimore to Richmond, Virginia to engage in commercial sex. The defendant paid Victim 6 at least $1,000 in cash for one of these trips. Records received from the Westin Hotel in Richmond, Virginia reveal multiple overnight stays by the defendant between August 2019 and March 2020.

Beginning at a time unknown and continuing until the time of her death in May 2019 due to a drug overdose, the defendant regularly engaged in commercial sex with Victim 7. Victim 7

discussed both her drug addiction and her desire to obtain treatment for her addiction with the defendant.

On December 9, 2019, the defendant and his attorney met with investigators for an interview in relation to a sex trafficking investigation involving alleged sex trafficker De'Angelo Johnson and Victims 1, 2, 3, and 4, with whom the defendant had engaged in commercial sex. During this interview, the defendant was asked whether he was aware that the sex trafficking victims were drug users. He was shown photographs of Victim 1, Victim 2, Victim 3, and Victim 4. The defendant indicated that he only knew that Victim 4 was a drug user, and stated that he did not believe the other victims were using drugs and that he had never seen them high. The defendant asserted that he had been the owner of the Mountain Manor drug treatment facility for ten years, so he would have been able to recognize drug use.

## Search Warrants and Arrest

On June 10, 2020, law enforcement executed a warrant for the defendant's arrest and a federal search warrant to search his person, his office located at 20 Commerce Street, and his vehicle. The defendant's office contained a large sectional couch, which converted to a bed which had a sheet on it. In his desk were numerous sex toys and filming equipment.

As part of this search warrant, law enforcement was authorized to search the contents of any electronics devices seized during execution of the searches.

An Apple iPhone 11 Pro Max cellphone was seized from the defendant's person and forensically analyzed. This cell phone contained numerous messages related to commercial sex. The phone also contained images and videos of Victims engaging in commercial sex with the defendant.

The defendant's phone contains numerous text messages with D.G., who is known to reside in Florida. On May 17, 2019, the defendant texted D.G., "Getting old is a bitch. We'll get together, do some blow, bang some hookers and commiserate." On July 29, 2019, the defendant told D.G. that he was on the plane headed down and has his friend with him; D.G. tells the defendant that he has another girl that, "Gets high etc." On August 1, 2019, the defendant wrote to D.G., "I think it's funny my girl is 5 years younger, comes from much humbler beginnings" and D.G. responds, "[Victim 6] is super cute and nice" and the defendant replies, "And OMG can she fuck!" This text message exchange on July 29, 2019 and August 1, 2019 occurred during the trip to Florida in which the defendant paid Victim 6 $5,000 to attend and engage in commercial sex with him.

In text messages between the defendant and Victim 6, Victim 6 talked about being lonely, money hungry, and referenced her drug use. On June 6, 2020, the defendant stated that he would send Victim 6 more money if she would "do some sexy FT [FaceTime] with me now." On June 9, 2020, the defendant playfully wrote to Victim 6 in reference to him sending her money to get a tattoo, "Ok remember- Property of CJN [Charles John Nabit] I sent $100" and "see when you're nice to me, I'm nice to you."

Victim 7 repeatedly discussed her drug addiction with the defendant in text messages. On August 13, 2018, Victim 7 told the defendant that she filled out an application for Mountain Manor treatment center, and the defendant replied, "As you recall, I used to own MM and my ex-partner still does." On August 14, 2018, Victim 7 told the defendant that she was going to drug rehabilitation in New Jersey and stated it will "give me a break from Baltimore."

On August 18, 2018, the defendant texted Victim 7's mother about Victim 7 going to drug rehabilitation. The defendant stated that Victim 7 had been using opiates again, but that "she seemed to handle crack ok for weeks." On May 19, 2019, the defendant and Victim 7's mother again discussed Victim 7's drug addiction. On May 23, 2019, Victim 7's mother informed the defendant that Victim 7 overdosed on drugs and died.

Five GoPro cameras were seized from the defendant's office during execution of the search warrant. The cameras contained numerous recordings of commercial sex acts between the defendant and the Victims, as well as various other women.

The defendant transported Victim 6, A.N., in interstate commerce, that is from Maryland to Florida, with the intent that A.N. engage in prostitution.

Further, the defendant used a facility of interstate and foreign commerce to promote and carry on, and to facilitate the promotion and carrying on of a prostitution business by using the internet to communicate and make arrangements, including scheduling "dates" and making payments, for commercial sex acts.

SO STIPULATED:

*Mary W. Setzer*
Mary W. Setzer
Daniel A. Loveland, Jr.
Assistant United States Attorneys

2/24/21
Date

Charles J. Nabit
Defendant

2/24/21
Date

Steven A. Allen, Esq.
Aidan Smith, Esq.
Counsel for Defendant