# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA    *

     Plaintiff    *

v.    *     Case No. 21-cr-38-GLR

CHARLES NABIT    *

     Defendant    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## SENTENCING MEMORANDUM (REDACTED)
## OF CHARLES J. NABIT

Steven A. Allen (Federal Bar No. 00607)
sallen@pklaw.com
Aidan F. Smith (Federal Bar No. 29312)
asmith@pklaw.com
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD 21204
410-339-6779
410-832-5602 (fax)

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

OFFENSE CONDUCT ........................................................................................................3

A.     A.N. – The Woman in the Criminal Information.................................................4

B.     The Other Sex Workers Referenced in the Statement of Facts ...........................6

C.     Mr. Nabit Had No Involvement With De'Angelo Johnson .................................7

D.     Placing Some of the Facts in the Statement of Facts in Context ......................10

CHARLES J. NABIT'S MENTAL HEALTH CARE TREATMENT SINCE HIS ARREST ON JUNE 10, 2020.................................................................................................................13

MR. NABIT'S REMORSE AND ACCEPTANCE OF RESPONSIBILITY..............................18

MR. NABIT'S LENGTHY INVOLVEMENT IN COMMUNITY SERVICE AND CHARITBLE ACTIVITIES ..................................................................................................19

WHAT WOULD BE A REASONABLE SENTENCE IN THIS CASE SENTENCING GUIDELINES.....................................................................................................................24

MR. NABIT SHOULD BE SENTENCED AS A CUSTOMER AND NOT A SEX TRAFFICKER .....................................................................................................................27

CONCLUSION...................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                     **Pages**

*Caminetti v. United States*,
 242 U.S. 470, 489–90 (1917) ........................................................   28

*Mortensen v. United States*
 322 U.S. 369, 377 (1944) ..............................................................   28

*Rewis v. United States*,
 401 U.S. 808, 811 (1971)...............................................................   30

*United States v. Durham*,
 902 F.3d 1180, 1195 (10th Cir. 2018) .........................................   28

*United States v. Footman*,
 66 F. Supp. 2d 83 (D. Mass. 1999) *aff'd* 215 F.3d 145 (1st Cir. 2000).........   29

*United States v. Francis*,
 329 Fed. Appx. 421 (4th Cir. 2009)..............................................   28

*Unites States v. Holland*,
 381 F.3d 80 (2nd Cir. 2004) .......................................................   29

*United States v. Puentes*,
 413 Fed. Appx. 563 (4th Cir. 2011)..............................................   28

*United States v. Sabatino*,
 943 F.2d 94, 103 (1st Cir. 1991) .................................................   29

*United States v. Smith*,
 456 Fed. Appx. 255 (4th Cir. 2011).............................................   30

*United States v. Toler*,
 901 F.2d 399, 402 (4th Cir. 1990) ...............................................   25

*United States v. Ventura*,
 2013 WL 6228916 (D. Md. Nov. 25, 2013) ..................................   29

*United States v. Whitehead*,
 456 Fed. Appx. 255, *5 (4th Cir. 2011)........................................   30

**Statutes**

18 U.S.C. § 1952(a)(3) ................................................................................................ 30-31

18 U.S.C. § 2421 ......................................................................................................... 2

**Other Authorities**

U.S. Sent'g Guidelines Manual § 3D1.2 ........................................................................ 24-27

U.S. Sent'g Guidelines Manual § 3D1.2, Application Note 4 ........................................ 26

U.S. Sent'g Guidelines Manual § 3D1.4 ........................................................................ 24

U.S. Sent'g Guidelines Manual § 3G1.1, Special Instructions at Subsection (d)(1) ........ 24

U.S. Sent'g Guidelines Manual § 5C1.1 ........................................................................ 24

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| Plaintiff | * | |
| v. | * | Case No. 21-cr-38-GLR |
| CHARLES NABIT | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SENTENCING MEMORANDUM (REDACTED) OF CHARLES J. NABIT

Defendant Charles J. Nabit, by Steven A. Allen, Aidan F. Smith and Pessin Katz Law, P.A., submits this Sentencing Memorandum (Unredacted) in connection with Charles J. Nabit's sentencing, which is scheduled for June 24, 2021. [1]

## INTRODUCTION

This is a highly unusual case. Except for being a customer of prostitutes, which has brought Charles J. Nabit before this Court, Mr. Nabit has led an exemplary life. He has been a devoted and excellent father to two wonderful children; for decades Mr. Nabit has spent countless hours

---

[1] This Memorandum contains mental health reports prepared by Dr. Chris Kraft and Michael Wall, LCSW-C, who have been providing mental health treatment to Mr. Nabit since mid-June 2020, Exhibits 1 and 2. The Sentencing Memorandum, at pages 13 to 18, discusses the contents of each report. Because the reports and the discussion about the contents contain highly confidential mental health information, two copies of the Sentencing Memorandum are being filed. One is a redacted copy in which the mental health providers' reports and the discussion of the contents of the reports have been redacted. The other, with a Motion to Seal, is the complete unredacted Sentencing Memorandum containing both mental health experts' reports and the discussion regarding the reports at pages 13 to the middle of page 18 of this Memorandum. The full unredacted Sentencing Memorandum with the reports has been provided via email to both the Government and Probation Officer.

engaged in community service; he has been extraordinarily involved with charitable activities; and Charles J. Nabit has been a highly respected member of the community.

Unfortunately, however, for the reasons explained by the two mental health experts who have been providing intensive treatment to Mr. Nabit since June 2020, Mr. Nabit became involved with prostitutes. That involvement was limited to being a customer of adult sex workers. He was never involved in sex trafficking.

The charge to which Mr. Nabit has pled guilty, violating the Mann Act, 18 U.S.C. § 2421, is rarely, if ever used to prosecute a customer who pays an adult prostitute to accompany the customer on a trip, but does not traffic her in connection therewith. Since 1986, virtually everyone involved with prostitutes who has been convicted of violating the Mann Act has been a sex trafficker, who transported women over state lines to work as prostitutes, or involved in the interstate transportation of minors.[2] Mr. Nabit was neither. He was never a sex trafficker. All of the sex workers with whom he was involved were adults and were in the business of offering commercial sex to many customers ("sex workers") before Mr. Nabit met them and while he was involved with them.

Mr. Nabit unequivocally admits his conduct. He accepts responsibility for using the services of sex workers. To address the root cause for his involvement with sex workers, Mr. Nabit since his arrest on June 10, 2020, has immersed himself in extensive psychotherapy to identify the root cause for his involvement with sex workers so that it will not happen again. As discussed below, over the last year, as of June 2, 2021, he has had 98 psychotherapy sessions,

---

[2]     As discussed below, undersigned counsel has performed comprehensive research for reported and unreported cases from District and Circuit Courts in to find other Mann Act cases since the statute was amended to its current form in 1986, in which the defendant was neither a trafficker, nor involved with a minor, but instead, like Mr. Nabit, was solely a customer of adult women prostitutes. Counsel has been unable to find any such cases.

comprising over 184 hours of psychotherapy with Dr. Chris Kraft, a highly respected Psychologist at the Johns Hopkins Sex and Gender Clinic who specializes in treating people such as Mr. Nabit. In addition, as of June 2, 2021, Mr. Nabit has also had 43 individual therapy sessions, comprising 47 hours of counseling with Michael Wall, LCSW-C, a very experienced Licensed Clinical Social Worker–Counselor.  The psychological reasons for Mr. Nabit's involvement with sex workers are detailed in Dr. Kraft and Mr. Wall's expert reports, attached hereto as Exhibits 1 and 2, respectively.

The mental health experts explain in their reports why Mr. Nabit became involved with and emotionally attached to sex workers.  The emotional attachments he developed with the women caused Mr. Nabit to give them money, most of which was not given at the time of sexual encounters, but instead was given to them by Mr. Nabit in response to hundreds of requests, primarily made through Cash App messaging.  The various women recognized Mr. Nabit's emotional attachment to them and frequently asked him for money, often claiming that they needed money for various personal reasons.  Mr. Nabit did not give the women money for the purpose of buying drugs.  He responded to their many requests for money, but, beyond his control, some of the money was used by some women for purposes other than why they claimed a need for money.

The totality of the unique circumstances of this case, including that Mr. Nabit was a customer and never a sex trafficker, the expert psychological reports which explain Mr. Nabit's involvement with sex workers, and Mr. Nabit's long and extremely commendable history of community service and charitable activities require a lesser sentence than that being sought by the Government.

## OFFENSE CONDUCT

All of the women with whom Mr. Nabit had commercial sex were adults, as noted in the

Stipulated State of Facts ("Statement of Facts").  Each woman was engaged in providing commercial sex services to multiple different customers before they first met and during the time they knew Mr. Nabit.  On information and belief, some of the women are still engaged in providing commercial sex services.

### A.N. – The Woman in the Criminal Information

A.N., the woman identified by the Government as Victim 6, is the woman with whom Mr. Nabit took the trip to Florida, which was charged in the Criminal Information.  Prior to Mr. Nabit meeting A.N. in early 2019, A.N. was a professional sex worker who sought and obtained customers over the internet.[3]  After Mr. Nabit began seeing A.N., he developed a strong emotional attachment to her, as detailed in the experts' reports and also shown in the discovery produced by the Government.

After developing a strong attachment to A.N., Mr. Nabit asked A.N. to accompany him on the trip to South Florida in late July 2019 for which he agreed to pay her $5,000 to accompany him.  During the trip Mr. Nabit treated A.N. like a girlfriend.  They dined at fine restaurants, they went shopping and together they enjoyed the South Florida area.  A.N. did not have sexual relations with anyone other than Mr. Nabit during the trip.  She went to South Florida as Mr. Nabit's escort, solely to be with Mr. Nabit.

Mr. Nabit never trafficked A.N. during the trip to Florida, or at any other time.  In fact, Mr. Nabit never trafficked anyone.  In addition, A.N. was also the only sex worker who traveled outside of Maryland with Mr. Nabit.

---

[3]      In addition to A.N., several of the other women also advertised on the internet.  As recent as this month, an ad appeared for at least one of them.

**Page 4 of 34**

Mr. Nabit's emotional attachment and relationship with A.N. continued to his arrest on June 10, 2020. For part of that time, to the end of 2019, she lived in Baltimore and they primarily met at his office for sexual encounters after his staff had left for the day. He treated her like a girlfriend, including her accompanying him on a few of his business travel to Richmond, where Mr. Nabit had business interests. In connection with her travel with Mr. Nabit to Richmond, Mr. Nabit, as on the trip to Florida, treated A.N. as if she was a girlfriend, including taking her out for fine dining and shopping. Like the trip to Florida, Mr. Nabit was the only person with whom A.N. had sexual relations when she traveled to Richmond.

At the end of December 2019, A.N. left Baltimore and moved to North Carolina, where she initially lived with her parents. Because of Mr. Nabit's strong emotional attachment to A.N., Mr. Nabit remained in close contact with A.N. after her move to North Carolina and until his arrest. After she left Baltimore, as the Government's discovery shows, they engaged in numerous text message communications on virtually a daily basis. Mr. Nabit made it clear to A.N. that he cared for her. A.N., to keep Mr. Nabit emotionally attached to her so that he would continue sending her money, expressed feelings for him. Because of his emotional attachment to A.N., Mr. Nabit continued to send her money until his arrest. This was notwithstanding that the last time they had sexual relations was in late January 2020. [4]

Mr. Nabit gave A.N. multiple tens of thousands of dollars. Some of the money was given to her at the time of sexual encounters. Most of the money, however, was given to A.N. in response to numerous requests which she made to Mr. Nabit. A.N. recognized Mr. Nabit's emotional attachment to her and frequently asked him for money.

---

[4]     The last travel to Richmond was in late February 2020, during which Mr. Nabit did not have sexual relations with A.N.

**Page 5 of 34**

As the Cash App records produced in discovery by the Government show, approximately half of the money he sent to sex workers by Cash App was sent to A.N.  Of that, approximately $19,000 of the money sent to A.N. via Cash App was sent in 2020, most of which after the last time Mr. Nabit had sexual relations with her.  Mr. Nabit also sent A.N. thousands of dollars via other means, much of which was sent after the last time he had sexual relations with her.

After Mr. Nabit was arrested on June 10, 2020, A.N. made several attempts to contact him, presumably to continue getting money from him.  Mr. Nabit did not respond to those attempts. Since his arrest, as discussed below, Mr. Nabit, through intensive psychotherapy, which began shortly after his arrest, has successfully detached himself from A.N. and the other women.

**The Other Sex Workers Referenced In The Statement Of Facts**

All of the women identified by the Government in the Statement of Facts were professional prostitutes before they met Mr. Nabit.  The women identified by the Government as Victim 2 (S.G.), Victim 4 (N.H.), Victim 5 (K.M.) and Victim 7 (A.C.), worked in bars on the Baltimore Block as exotic dancers and also had commercial sex with men in the bars.  Several of the bars on the Block make on-premises rooms available for use by sex workers who work in the bars to engage in commercial sex with customers.  Mr. Nabit met and became a customer of each of the four women at bars on the Baltimore Block.

After Mr. Nabit's initial sexual encounters with each of the four women in on-premises back rooms in the bars, over time, the sexual encounters moved from the back rooms in the bars and primarily took place at his office on Commerce Street, a short distance from the Baltimore Block.  Some of the sexual encounters also took place in hotels.

All sexual encounters which took place in Mr. Nabit's office occurred after Mr. Nabit's staff had finished work and left the building.  At no time did anyone from Mr. Nabit's staff have any knowledge that after hours Mr. Nabit met with sex workers in his office.

Victim 1 (R.H.) and Victim 3 (E.D.) were sex workers before Mr. Nabit met them.  Mr. Nabit met R.H. in April 2019 when S.G. brought R.H. with her to Mr. Nabit's office for a sexual encounter.  Mr. Nabit met E.D. when R.H., with whom E.D. had a personal relationship, brought E.D. to Mr. Nabit's office for a sexual encounter.

Mr. Nabit generally paid each of the women with whom he had commercial sex at the time of each sexual encounter.  In addition, each of the women, recognizing that Mr. Nabit had developed an emotional attachment to them, repeatedly and frequently sent Mr. Nabit requests for money, primarily via Cash App, often giving him a variety of reasons for why they needed money, including for rent, lodging, food, medical and various personal needs.  Mr. Nabit often gave the women money in response to their numerous requests.[5]

The requests for money from some of the women continued up until Mr. Nabit's arrest in June 2020, even though he had not had sexual encounters with most of them after early 2020. During 2018, 2019 and 2020, he gave the women thousands of dollars in response to their repeated frequent requests.  The largest recipient of money was A.N.

After Mr. Nabit's arrest on June 10, 2020, he continued to receive requests for money from several of the women, including A.N.  He did not respond.

**Mr. Nabit Had No Involvement With De'Angelo Johnson**

---

[5]     Mr. Nabit did not give the women money for the purpose of buying drugs, although, he could not control what they did with the money he gave them, including whether they truly used it for the reasons they gave.

In the Statement of Facts, the Government included a reference to De'Angelo Johnson, who is currently under Indictment for sex trafficking. Johnson was arrested on May 23, 2019, and has been incarcerated since then.

The Government alleges that prior to Johnson's May 23, 2019 arrest, he was a pimp for a number of women, including, on occasion, for S.G., N.H., R.H. and E.D.[6] Mr. Nabit, however, did not know Johnson, and had no involvement with Johnson in any manner.

Two cell phones were seized from Johnson, one in January 2019 by the Baltimore County Police and the other when he was arrested on May 23, 2019 by the Howard County Police. The Government has thoroughly reviewed the contents of Johnson's cell phones. The Government also seized Mr. Nabit's cell phone at the time of his arrest and has reviewed its contents with a fine tooth comb. In discovery the Government produced thousands of text messages from Johnson's and Mr. Nabit's cell phones.

There were no text messages from Mr. Nabit to Johnson or from Johnson to Mr. Nabit. None of the text messages between Mr. Nabit and the four women who the Government claims were involved with Johnson, S.G., N.H., R.H. and E.D., mentioned Johnson nor referred to him by his alias, "Cowboy." Mr. Nabit did not know Johnson and had no dealings with him.

To confirm that Mr. Nabit neither knew nor dealt with Johnson, Mr. Nabit took a polygraph exam on July 30, 2020, administered by retired FBI polygraph examiner William Gonnelli. During the polygraph exam, Mr. Nabit was questioned about whether he ever had any communications with Johnson and whether any of the women ever told him that they worked for Johnson. Mr. Nabit passed the polygraph exam because he did not know, nor had communications nor dealings

---

[6]     The Government has not alleged that Johnson had any involvement with A.N., K.M. or A.C.

with Johnson.  A copy of the polygraph examiner's report and curriculum vitae are attached as Exhibit 3.

Importantly, and as the Government knows, even Johnson's own statements captured in recordings which the Government produced in discovery, establish that Mr. Nabit neither knew nor dealt with Johnson.  After Johnson learned that the Government was alleging that Mr. Nabit was connected to and had paid Johnson tens of thousands of dollars, Johnson had telephone conversations which were recorded by the Detention Center where he was incarcerated at the time. During one recorded call Johnson emphatically stated:

> "Listen.   I do not know that man."
>
> ***
> "I do not know him."
>
> ***
> "I don't know this man, never seen him, never heard of him."
>
> ***
> "I don't know him."[7]

In the calls, Johnson also denied getting money from Mr. Nabit.

Even though Mr. Nabit never had any dealings with Johnson, the Government wants to associate him with Johnson, and insisted that the Statement of Facts include a reference to the fact that the Cash App account to which Mr. Nabit sent money on April 11, 2019 was registered with Cash App in Johnson's name.  Mr. Nabit does not dispute that he sent money to that Cash App account on April 11 and agreed to the inclusion in the Statement of Facts that it was registered to Johnson because that it what the discovery shows.  Mr. Nabit, however, did not know that the Cash

---

[7]     Copies of the recordings produced by the Government can be provided if the Court wishes to listen to them.

App account was registered to or associated with Johnson, nor did Mr. Nabit have any dealings with Johnson.

The discovery from the Government shows that S.G., who introduced Mr. Nabit to R.H., used that Cash App account.  In March 2019, S.G. directed Mr. Nabit to send money to her at that Cash App account.  Mr. Nabit complied with her direction and from late March to mid-April 2019 sent money to S.G. to the Cash App account address she gave him,"$cashcow10," which unbeknownst to Mr. Nabit, was registered to Johnson who used the name Cinnamon.

The total amount of money sent by Mr. Nabit to that account between late March and April 21, 2019, the only time he sent money to that account, was $895, not the approximately $90,000, which the Government implied in the Statement of Facts.  A list made from the Government's Cash App discovery of the dates, and amount on each date on which Mr. Nabit sent money to that Cash App account is detailed on the list, prepared from the Cash App discovery provided by the Government, attached hereto as Exhibit 4.  Mr. Nabit did not know that Johnson was involved with the account.  There was no discovery produced by the Government which established that Mr. Nabit was aware of Johnson's association with the account.

The Government has inserted Johnson into Mr. Nabit's case, even though Johnson does not belong in it, to try to create an inference that Mr. Nabit knew and had dealings with Johnson, who the Government is prosecuting in a separate case for being a sex trafficker.  The Government wants to associate Mr. Nabit with a sex trafficker, in order to argue, *inter alia*, that Mr. Nabit should be treated more harshly than other persons who, similar to Mr. Nabit, are solely customers of adult prostitutes.  Mr. Nabit was always only a customer of the various women.

**Placing Some Of The Facts In The Statement Of Facts In Context**

The following will place some of the facts in the Statement of Facts in context:

**Page 10 of 34**

1.      Mr. Nabit was not violent with the women, all of whom were adults.   The Government seized videos of Mr. Nabit with sex workers – there is no evidence of physical violence on the videos.

2.      Mr. Nabit does not dispute that he videoed some of the sexual encounters he had with sex workers.  But, each woman knew at the time that the video was being made.  While a couple of the women expressed a concern about being videoed, that was because they did not want the video posted on the internet.  Mr. Nabit assured them that the video was solely for himself and that none of the videos would be posted on the internet.  Mr. Nabit did not post any of the videos on the internet.

3.      With regard to the Mountain Manor drug treatment facility, it is correct that it was one of the many business ventures with which Mr. Nabit at one time was involved.  At Mountain Manor, Mr. Nabit had a partner who handled patient services, i.e., drug treatment.  Mr. Nabit was involved with business matters.

In connection with A.C., who died from a drug overdose in May 2019, Mr. Nabit repeatedly tried to get A.C. to stop using drugs.  One of the efforts involved enlisting the help of his former partner at Mountain Manor to assist in obtaining A.C.'s admission to a residential drug treatment facility in Hagerstown.  A.C. participated in the Hagerstown program, but, unfortunately, it did not work.

Mr. Nabit had a strong emotional attachment to A.C., and because of that emotional attachment he obtained and kept a copy of her obituary in his office.  The obituary was seized by the Government when they searched Mr. Nabit's office on June 10, 2020, a year after her death.

4.      Mr. Nabit was aware that some of the sex workers used drugs, and that N.H., as Mr. Nabit told the Government when he was interviewed on December 9, 2019, had track marks on her arms.[8]

With regard to A.N., Mr. Nabit has admitted that on several occasions she used a very small amount of cocaine in his presence, only some of which he gave her.  However, there is nothing in the Statement of Facts regarding Mr. Nabit providing drugs to anyone else because that would not be true.  The Government did not produce evidence in discovery that would support a claim that Mr. Nabit gave drugs to anyone other than a very small amount of cocaine to A.N.  Additionally, although a user, A.N. was not addicted to drugs.[9]

---

[8]      There was an occasion when K.M. asked Mr. Nabit to drive her to obtain methadone because she claimed to have lost hers.  He drove her to get it on that occasion. As the text messages which the Government produced in discovery show, however, he repeatedly told K.M. to stop using drugs.

[9]      Mr. Nabit was interviewed by the Government on December 9, 2019 regarding what, if anything he knew about Johnson.  Mr. Nabit truthfully told the Government that he did not know De'Angelo Johnson, which is corroborated by the Johnson recording referred to above, which was produced in discovery in accordance with the Government's *Brady* obligation.

During the interview about Johnson, Mr. Nabit was shown pictures of S.G., R.H., N.H. and E.D., sex workers with whom the Government claims Johnson was involved.  Mr. Nabit identified each woman as a person with whom he had commercial sex.  When asked if the four women used drugs, he told the Government that he had seen track marks on N.H.'s arms, but that none of the women had used drugs in his presence.  As the report by Special Agent D'Angelo of Mr. Nabit's interview states:

> Nabit denied that he ever saw the other girls high or using drugs and he said he did not believe they [S.G., R.H., E.D., N.H.] were using the times that he saw them.  Nabit later said that he would not be surprised if the girls abused drugs, but stated that they never appeared high on drugs [when they were with him].

Since A.N., K.M. and A.C. had no involvement with Johnson, the Government, who was interested in Johnson when they interviewed Mr. Nabit, did not show their pictures to Mr. Nabit, nor ask him about them.  Had Mr. Nabit been questioned about A.N., K.M. or A.C. he would have told the Government that K.M. and A.C. were addicted to drugs, that he told both of them on numerous occasions to stop using drugs, and that he was instrumental in A.C. obtaining residential

**CHARLES J. NABIT'S MENTAL HEALTH CARE TREATMENT
SINCE HIS ARREST ON JUNE 10, 2020**

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

<span style="color:red">REDACTED</span>

## MR. NABIT'S REMORSE AND ACCEPTANCE OF RESPONSIBILITY

Mr. Nabit's remorse and acceptance of responsibility are heartfelt and sincere. Recognizing that he has a problem that must be fixed, he has engaged in intensive psychotherapy for a year with Dr. Kraft and Mr. Wall.  Very importantly, Mr. Nabit has admitted to himself the problem which caused him to be a customer of sex workers and with the help of the mental health professionals, Mr. Nabit is diligently working to address and correct the problem so that he will have no involvement with sex workers in the future.

The various letters from his wife and personal and business associates, attached to this Memorandum in Exhibit 5, tell the Court a lot about Mr. Nabit, including about his sincere and true remorse, acceptance of responsibility and the many community service and charitable good deeds in which he has been involved for decades.  A common observation in the letters is Mr.

_____

Officer, and being given information regarding how to contact Dr. Kraft and Mr. Wall, the Probation Officer did not contact either of Mr. Nabit's mental health providers.  It is submitted that contacting the mental health experts would have been important to the Pre-Sentence Investigation and preparation of the Pre-Sentence Report, and the sentencing recommendation which the Probation Officer has made.

Nabit's admission to others of the fact that he was involved with commercial sex workers, his deep remorse for his conduct, and his admission that he is obtaining the help he needs to address the reasons for that conduct.  Mr. Nabit's remorse and acceptance of responsibility are attested to in many of the letters in Exhibit 5.

The first of the many letters about Mr. Nabit in Exhibit 5 is a letter from his wife, Mary Kathryn "Mary Kay" Nabit.  She is the true victim in this case – Mr. Nabit's involvement with the sex workers has been very hurtful to her.

Nevertheless, she has written a letter to the Court in support of Mr. Nabit.  She notes that he has always been "a good father to our children," "devoted to them and they to him."  She reports "I know that Chuck has been working extremely hard to understand, control and correct his addictive behaviors."  Because of the intensive therapy in which he has been involved, she has "personally observed major changes in him during the last year. . . .  I feel he has truly benefitted from it and has become a much better husband."  She notes "He has been actively engaged in learning about, and recovering from, his addictive behaviors."[12]

## MR. NABIT'S LENGHTY INVOLVEMENT IN COMMUNITY
## SERVICE AND CHARITABLE ACTIVITIES

As many of the letters in Exhibit 5 attest, Mr. Nabit has a long and extraordinary history of dedicated community service and involvement in charitable activities.  In contrast to many others who after being charged, perform some limited community service for the first time, Mr. Nabit is not a Johnny Come Lately, but instead for decades has worked to make the community a better

---

[12]     Unfortunately in preparing the Pre-Sentence Report in this case, the Probation Officer not only failed to contact the therapists, she also did not contact Mary Kay Nabit to obtain information from her regarding Mr. Nabit, which we submit would have been important to the Pre-Sentence Investigation and the Report, and would have impacted the Probation Officer's opinions about Mr. Nabit.

place.  He has contributed countless hours of his time to community service activities.  In addition, in contrast to many others, he has also put his money where his mouth is – both raising money for and contributing substantial sums to many charitable organizations.  He has been involved in and committed to community service and charitable activities for decades and for all of the right reasons.

Approximately 10 years ago, Mr. Nabit established Mission Driven Dining, which operates the Baltimore restaurant Ampersea, formerly the Waterfront Kitchen.  Through Mission Driven Dining, Mr. Nabit has worked with The Living Classroom Foundation, to advance and implement their program.  From the beginning, Mission Driven Dining has embraced and fostered two important goals.  The first is the growth of the nationally acclaimed Baltimore Urban Gardening with Students ("BUGS"), which utilizes the Mission Driven Dining restaurant and a greenhouse donated by Mission Driven Dining as living classrooms to teach Baltimore City middle school students about food, nutrition, math and life skills.

The second important Mission Driven Dining program is supporting persons involved in The Living Classroom Project Serve and Project Fresh Start programs.  Project Serve seeks to rehabilitate and provide gainful employment to persons who were previously incarcerated as they re-enter society and the workforce.  Project Fresh Start seeks to positively help and influence Baltimore City teenagers whose lives have gone off course, by providing training leading to employment opportunities.

The value of Mr. Nabit's commitment to community service and his humanity is vividly illustrated by Lamont Cousins, who has written a letter on Mr. Nabit's behalf which is part of Exhibit 5 and will be present to testify at Mr. Nabit's sentencing hearing.  Mr. Cousins was incarcerated for years.  After Mr. Cousins' release from prison, Mr. Nabit hired Mr. Cousins to

work at Mission Driven Dining.  Mr. Cousins started as a dishwasher.  But as Mr. Cousins worked at the restaurant, Mr. Nabit put aside the preconceived notion many have about ex-cons, recognized the good in Mr. Cousins and promoted Mr. Cousins several times.  Today, Lamont Cousins is the General Manager of the restaurant and Mr. Nabit has made him a 10% owner of Mission Driven Dining.  Very few people would do that for someone coming from Mr. Cousins' background.

One of the organizations to which Mr. Nabit has been committed is the March of Dimes.  He has served on its Board and helped it raise money.  One of the activities in which he has been deeply involved is the Great Chesapeake Bay Swim, which has raised over $2 million dollars for the March of Dimes and other organizations.  He has spent hundreds of hours making the event a success.  As Catherine Calato notes in her letter, which is part of Exhibit 5, "Chuck's commitment to the Great Chesapeake Bay Swim is more than commendable.  Over 18 years I have seen firsthand the effort Chuck put forth into the tiniest detail to pull off a yearly event of massive proportion and with over a thousand participants. The entire event is a total physical and emotional drain for him."  Sherri Tolley, in her letter in Exhibit 5, expresses similar observations.

Mr. Nabit has been very involved with the University of Maryland Medical System where he has served on the UMMS Foundation Board, the UMMS Children's Hospital Board and was Chairperson of the fundraising initiative for the pediatric heart program.  He has been active with the Walters Art Museum, where he served as Chair of the Technology Committee, on numerous sub-committees including audience engagement and fundraising.

Mr. Nabit has also worked on the Hippodrome Foundation Board since its inception, including as Chair of the Fundraising Committee.  He has served on the B&O Railway Museum Board, where he was Vice President; the Calvert School Board of Trustees, where for two years Mr. Nabit was the Chairperson of the school's Capital Campaign; the Baltimore Council on

Foreign Affairs, where he has served on the Board; the Church of the Redeemer Vestry where he served on the Building and Grounds Committee and supervised renovations to the property; the University of the South, Sewanee which work for the school and its students is described in the letters in Exhibit 5 from President Emeritus and Vice Chancellor Dr. Joel Cunningham and Jett Fisher.  A list of Mr. Nabit's many public service and charitable activities is attached hereto as Exhibit 6.  His charitable activities include the Nabit Foundation through which Mr. Nabit has made in excess of $5,000,000 in charitable donations.

Mr. Nabit, as Baltimore community leader Edward St. John noted in his letter in Exhibit 5, "He has been dedicated to serving the interests of our community.  His efforts have helped many people and organizations which serve to better the lives of persons living in the Baltimore Community.  I personally know that his work is highly regarded and has been very valuable." Similar sentiments are expressed in other letters in Exhibit 5.  Mr. Nabit has always given back to the community.

Unfortunately, the publicity associated with Mr. Nabit's arrest on June 10, 2020 has caused Mr. Nabit to have to disassociate himself from many of the civic organizations on whose boards he was serving at the time.[13]  Yet, Mr. Nabit has found another outlet for his long term commitment to community service.  Since shortly after his arrest, Mr. Nabit has been very involved with Heaven On Earth NOW, a community service organization which provides food, clothing and household necessities to previously homeless persons.  Mr. Nabit, in a hands-on manner, has been delivering services to Heaven On Earth NOW's clients and performing other tasks.

---

[13]    The Government issued press releases in which it has associated Mr. Nabit with sex trafficker De'Angelo Johnson and suggested that Mr. Nabit was involved in sex trafficking.

Anecdotally, Mr. Nabit has also been there in times of need for others.  One instance is described in Darrrell Taylor's letter to the Court in Exhibit 5, Mr. Taylor recounts the help, including financial help, Mr. Nabit gave Mr. Taylor's family when Mr. Taylor's daughter suddenly died in March 2019.  Mr. Nabit was not only one of the first non-family member to call Mr. Taylor, Mr. Nabit provided "financial support" to the Taylor family which lifted "a major financial burden" because Mr. Taylor's daughter did not have life insurance.  Sewanee President Emeritus Cunningham recounts Mr. Nabit's "exemplary care for others," noting that he has been "moved by the needs of students with limited resources and by young people with severe illnesses."  Mr. Nabit assisted Rose Carpenter when her father suddenly passed, helping her when her husband died and giving guidance in connection with eldercare for Ms. Carpenter's mother.  Mr. Nabit provided care and financial support to their mutual friend Harvey who lost his business and developed cancer that ultimately took his life.  As James Vitale stated in his letter – I've never seen another person so generous with their time in an effort to help guide so many organizations. He did this from his heart, and for no other reason but to try and help improve the lives of others."

Many defendants first become involved in a limited manner in some form of community service after their arrest to create an illusion.  In contrast, Mr. Nabit has a long history of community service and charitable activities which predate his arrest by decades.  He did not become involved in community service for sentencing purposes.  He has been extensively involved in community service and charitable activities because that is who he is.  He cares about people and is dedicated to helping others.  Mr. Nabit never expected that he would ever have to stand in front of a Judge and discuss his good deeds.  Rather he selflessly has been truly dedicated and committed to helping his community.

## WHAT WOULD BE A REASONABLE SENTENCE IN THIS CASE

## SENTENCING GUIDELINES

The Guidelines adjusted offense level in this case, as the Government stipulated in the Plea Agreement, is Level 13, which is within Zone C. Under Guideline § 5C1.1 a sentence in Zone C may consist of incarceration for one-half of the minimum term in the Guideline range, followed by home detention or community confinement for the remainder of the sentence. The sentencing range for Level 13 is 12 to 18 months. For Level 13 the Court can sentence a defendant to imprisonment for half of the minimum term specified in the guideline range, 6 months, followed by home detention or community confinement for the remainder of the period imposed by the Court. Application Note 5.

The Probation Officer, in her Pre-Sentence Report, in contrast to the Plea Agreement, however, has recommended a two level grouping enhancement because A.N. also accompanied Mr. Nabit to Richmond. That would have the effect of increasing the adjusted offense level to 15, moving the Guidelines calculation out of Zone C to Zone D, which would require that the entirety of the sentence be incarceration.

The basis for the Probation Officer's two level grouping enhancement is her theory that the travel A.N. took with Mr. Nabit to Richmond should be treated as stand-alone separate relevant conduct. Under her theory, the travel to Florida and to Richmond, under Guideline § 3D1.4 should have the effect of creating two units, one for Florida and another for Richmond, adding two levels under § 3D1.4 to the Guidelines calculation in this case.

The travel to Richmond, however, should not be treated as separate relevant conduct, but rather should be grouped with the trip to Florida as part of a single group under Guideline § 3D1.2(b), which would have no effect on the Guidelines calculation. Section 3D.2(b) applies

"when counts [in this case the travel to Florida and the new Group 2 relevant conduct added by the Probation Officer, travel to Richmond] involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."

The travel to Florida and to Richmond in the instant case involved the same person, A.N., who was a professional sex worker, both before Mr. Nabit met her and while he knew her.

Guideline 2G1.1 Special Instruction at Subsection (d)(1) in the Application Notes recognizes that for the purpose of grouping when there are multiple trips into one group depends upon whether there was one or more than one victim. In this case, there was only one, A.N.

Mr. Nabit became emotionally attached to A.N. as the mental health expert reports of Dr. Kraft and Mr. Wall explain. She accompanied him to Florida and Richmond, on which trips he treated her like a girlfriend. Each trip involved the "same victim," A.N., and each was "connected by a common scheme or constituting part of a common scheme or plan," taking the woman with whom Mr. Nabit had a strong emotional attachment on trips with him. *See* Guidelines 3D1.2(b).

A.N. did not suffer separate harm from the multiple trips. They were part of Mr. Nabit's emotional attachment to her and her ongoing relationship with Mr. Nabit, a single course of conduct. Mr. Nabit treated her like a girlfriend during the travel. Moreover, he did not limit giving her money to only when she traveled with him. She made it appear to Mr. Nabit that she truly cared for him and he gave her thousands of dollars in response to her numerous requests for money. The trips were part of the relationship, and represented "one composite harm," not separate instances of harm to A.N. A.N. did not suffer harm from traveling with Mr. Nabit to Florida and to Richmond.

The grouping rules, as the Fourth Circuit stated in *United States v. Toler,* 901 F.2d 399, 402 (4th Cir. 1990), require a determination of whether the two offenses, here the travel to Florida and Richmond with A.N., "are sufficiently interrelated that, in essence the two offenses are but alternative means of punishing 'substantially the same harm . . . If the offenses are closely interrelated, they will be grouped under subsection (a) or (b) and treated as if they were one offense for purposes of sentencing." *See* Application Note 4 to § 3D1.2. Here, there was but one victim, A.N., and no separate harm was suffered by A.N. in connection with her traveling with Mr. Nabit to Florida and Richmond. In this case, the trips should be treated as a single offense for Guideline purposes.

The Government was aware of the travel to Richmond prior to the plea agreement, including it in the Statement of Facts. Yet, the Government did not treat the travel to Richmond as separate relevant conduct in the Plea Agreement. It is submitted that was because the travel to Richmond was part of a single course of conduct, a single offense for Guidelines purposes. The only group of separate relevant conduct the Government included in the Plea Agreement involved the money Mr. Nabit gave the sex workers, which under the Guidelines calculation made by the Probation Officer, does not result in any additional levels to the adjusted offense level of 13.

Moreover, during the period between Mr. Nabit's first and second plea hearing an issue came up regarding the calculation of the sentencing Guidelines and whether because of the Grouping Rules an adjustment needed to be made to increase the adjusted offense level of 13, moving the adjusted Guideline Level into Zone D. The issue involved the effect for Guidelines purposes of the relevant conduct in the Plea Agreement, the money given to the women.

The Probation Officer was aware at the time of the Richmond travel from the Stipulated Statement of Facts. Nonetheless she told counsel, both the Government and Mr. Nabit's counsel,

that the proper Guidelines calculation was Level 13.  Although aware of the Richmond travel, the Probation Officer did not indicate that it should be treated as separate relevant conduct or have an impact on the Guidelines calculation.  Mr. Nabit relied upon the Probation Officer's Level 13 calculation, with the Guidelines in Zone C, in going forward with his plea at the second plea hearing.

Under the facts of this case, and in accordance with Guideline § 3D1.2(b), the additional two grouping levels should not be applied.  Mr. Nabit's criminal history category is I and under the Guidelines the Court can split a sentence at Level 13 in Zone C between 6 months incarceration and home detention, although, as discussed below, a reasonable sentence in this case would be less.

## MR. NABIT SHOULD BE SENTENCED AS A CUSTOMER AND NOT A SEX TRAFFICKER

In paragraph 10 of the Plea Agreement, the Government and Mr. Nabit agreed that each could "advocate for a reasonable" sentence in this case.  Mr. Nabit submits that a reasonable sentence is less than the 12 to 18 month range under Level 13.

Being a customer of prostitutes is not a federal crime.  What made Mr. Nabit's involvement with A.N. a violation of federal law was traveling with her out of state, however, she was a consenting adult and the travel was not for the purpose of trafficking her.  Neither during the travel, nor at any other time, did Mr. Nabit traffic A.N. or anyone else.

What significantly differentiates Mr. Nabit's case from other Mann Act prosecutions since 1986, when the statute was amended to its present form, is that Mr. Nabit was only a customer. He was not a sex trafficker and A.N. was not a minor.  Undersigned counsel has thoroughly searched through the reported District Court and Court of Appeals decisions, Fed. Appx. decisions, and unreported decisions in Westlaw to try to find Mann Act cases since 1986 which would provide

**Page 27 of 34**

sentencing guidance in a case involving a defendant who, like Mr. Nabit, paid an adult woman to accompany him on an out of state trip, but did not traffic the woman to others during or as a result of the travel.  We could not find any such cases.  All of the cases involving transporting someone to another state for the purpose of trafficking that individual to others, or transporting minors.

That is consistent with the purpose of the Mann Act, which was enacted in 1910 to curb the interstate and international trafficking in women and girls.  *United States v. Durham*, 902 F.3d 1180, 1195 (10th Cir. 2018).  As the Supreme Court recognized in *Mortensen v. United States*, 322 U.S. 369, 377 (1944), when the Mann Act was enacted "Congress was attempting primarily to eliminate the white slave business which uses interstate and foreign commerce as a means of procuring and distributing its victims and to prevent panderers and procurers from compelling thousands of women and girls against their will and desire to enter and continue in a life of prostitution." (Internal quotations omitted).  Mr. Nabit is not a panderer, procurer nor trafficker.

The original language in the Mann Act broadly criminalized transporting women "for any immoral purpose."  Until 1986, the "any other immoral purpose" language was expansively used to prosecute persons not only for transporting women across state lines to traffic them, but also when the travel was for purposes which were subjectively believed to be "immoral," such as extramarital sexual relations.  *See Caminetti v. United States*, 242 U.S. 470, 489–90 (1917).

In 1986, Congress amended the Mann Act, removing the "for any other immoral purpose" language from it.  Since 1986 the Mann Act has been primarily directed at the transportation of sex workers to another state for the purpose of their being trafficked by pimps and panderers, persons engaged in the prostitution business, or where the person being transported is a minor.  *See United States v. Puentes*, 413 Fed. Appx. 563 (4th Cir. 2011)(attached as Appendix B)(Prostitution ring – Transportation of 100 women from out of state into Maryland for purpose of engaging in

prostitution); *United States v. Francis*, 329 Fed. Appx. 421 (4th Cir. 2009)(attached as Appendix A)(Maryland prosecution involving transportation of women from New York and New Jersey to work in a brothel in Maryland); *United States v. Ventura*, 2013 WL 6228916 (D. Md. Nov. 25, 2013)(attached as Appendix D)(Defendant operated a prostitution business in Maryland and Virginia and transported women from Maryland to work in a brothel in Virginia); *United States v. Sabatino,* 943 F.2d 94, 103 (1st Cir. 1991) (Defendant operated a multi-state escort service); *United States v. Footman*, 66 F. Supp. 2d 83 (D. Mass. 1999), *aff'd,* 215 F.3d 145 (1st Cir. 2000) (Pimp running a ring of prostitutes who were transported across state lines to engage in prostitution with various customers); *United States v. Holland*, 381 F.3d 80 (2nd Cir. 2004) (Defendant convicted under the Mann Act in connection with prostitution ring which recruited prostitutes to work in multiple states).

Mr. Nabit never trafficked A.N., or any other woman.  Mr. Nabit has never been a pimp, panderer nor has he been engaged in operating a prostitution business.  Mr. Nabit was solely a customer of adult sex workers with whom he developed emotional attachments and should be sentenced as a customer.  This case is outside of the heartland of Mann Act cases.

Accordingly, the question is whether a reasonable sentence for Mr. Nabit would be one which treats Mr. Nabit as transporting A.N. to traffic her, applying a base offense level for the traditional Mann Act case of 14, with an adjusted offense level of 13, with a sentencing range of 12 to 18 months.  Would a reasonable sentence be as much as two years as recommended in the Pre-Sentence Report?  Defendant submits that neither would be a reasonable sentence considering the unique facts of this case, that the purpose of the travel was not to traffic A.N., the psychological and emotional reasons for Mr. Nabit's conduct and the decades of valuable community service he has provided.

Instead, the driving force behind this case has always been that Mr. Nabit gave a lot of money to the sex workers. At the time of Mr. Nabit's arrest in June 2020, and throughout this case, the Government has strongly emphasized, as it did in paragraph 7(c) of the Plea Agreement, under the heading Group 2 on page 5 of the Plea Agreement, in the Statement of Facts, and in multiple press releases, that Mr. Nabit gave the women a lot of money. That was the basis for the charge in the Criminal Complaint which began this case, the Government's claim that by giving the sex workers money via Cash App, Mr. Nabit violated 18 U.S.C. §1952(a)(3), "Use of Interstate Facilities to Promote a Business Enterpriser Involving Prostitution."

18 U.S.C. Section 1952(a)(3) criminalizes the of use facilities of interstate commerce, such as Cash App, to "promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of . . ." a prostitution business. Mr. Nabit never did any of those things, he never operated nor was involved in a prostitution business.[14]

Since the Government claimed at the time the Complaint was filed, and still claims in the Group 2 relevant conduct in the Plea Agreement, that giving the women money via Cash App was a violation by customer Nabit of Section 1952(a)(3), it would be appropriate to examine the Guidelines to determine what sentence is provided for in the Guidelines for 18 U.S.C. § 1952(a)(3), the conduct at the heart of this case. The base offense level in the Sentencing Guidelines for the Section 1952(a)(3) offense, as the Government acknowledged on page 5, paragraph 7(e) of the

---

[14]   The seminal case interpreting the reach of 18 U.S.C. § 1952 (a)(3) is the Supreme Court's decision in *Rewis v. United States,* in which the Supreme Court held that the statute does not criminalize the conduct of customers of an unlawful business enterprise. 401 U.S. 808, 811 (1971). The Supreme Court stated that the "intent to . . . facilitate requires more than a mere desire to patronize the illegal activity." *Id.* (internal quotation omitted); *see also United States v. Smith*, 456 Fed. Appx. 255 (4th Cir. 2011) (attached as Appendix C) (The "Supreme Court agreed that 'intent to . . . facilitate' requires more than a mere 'desire to patronize the illegal activity.'"); *United States v. Whitehead*, 456 Fed. Appx. 255, *5 (4th Cir. 2011) (attached as Appendix E).

Plea Agreement, and as acknowledged by the Probation Officer, is Level 6.  Applying the two level reduction for acceptance of responsibility, the adjusted offense level would be Level 4, within Zone A, with a recommended sentencing range under the Guidelines of 0 to 6 months.  That is the appropriate range for customer Nabit.

Since the money given by Mr. Nabit to the women is at the heart of this case, the Guideline applicable to that conduct provides the Court with guidance as to how this case should be treated for sentencing purposes.  This case is outside of the heartland of Guidelines for the Mann Act and, more akin, because of the money sent by Mr. Nabit to the women, to 18 U.S.C. § 1952(a)(3), the violation of which for sentencing purposes would result in a sentencing range of 0 to 6 months.

It is significant to note that Mr. Nabit has already been punished beyond the sentence which the Court will impose.  Mr. Nabit has been publicly humiliated as a result of the multiple press releases issued by the Government associating Mr. Nabit with sex trafficker Johnson and suggesting that Mr. Nabit was a sex trafficker.  Because of the press releases suggesting he was a sex trafficker, Mr. Nabit has been ostracized by many in the community.  Implying that he was a sex trafficker, even though he was not, has humiliated his family.

Mr. Nabit has also suffered financial damage.  Mr. Nabit's business interests include involvement in the health care industry.  Because he has been convicted of a federal felony he will be debarred from participating in businesses which are involved with Medicare or any federal programs.  Because of the charge against him and his plea, as the letter from Drake Zaharris informs the Court, Mr. Nabit has been "forced to sell some businesses," which he had to sell "at substantially below market values," resulting in millions of dollars in losses.

Also, notwithstanding an excellent credit history, financial institutions with whom Mr. Nabit had a very good relationship before he was charged have closed bank and investment

accounts solely because of the criminal charge. He has had to hunt for a financial institution who, notwithstanding the charge and his conviction, will do business with him, and in the future he will have to pay commercial lending rates substantially higher than market rates.

In addition, Mr. Nabit, who has been a member of the Maryland Bar since 1980, although he has not actively practiced law for a number of years, has been disbarred. Mr. Nabit promptly notified Bar Counsel of his conviction after which Bar Counsel submitted a Joint Petition for Disbarment by Consent to the Maryland Court of Appeals.

## CONCLUSION

It is submitted that because Mr. Nabit was solely a customer and did not traffic sex workers; that all of the women were adults; because of the psychological reasons that caused Mr. Nabit to be involved with sex workers, as detailed in the mental health experts' reports; Mr. Nabit's extraordinary involvement in psychotherapy since June 2020; the mental health experts' opinions that as a result of the therapy he will not again be involved with sex workers; and Mr. Nabit's decades long and highly commendable history of community service and charitable activities, that a reasonable sentence in this case would be one consistent with what the Government has always treated as being at the heart of this case, the money he gave to the women. Under 18 U.S.C. § 1952(a)(3), the statute which the Government used to initially charge Mr. Nabit, his sentence would be within Zone A, within a range of 0 to 6 months. Because of the unique circumstances of this case, it is submitted that the range of 0 to 6 months is appropriate in this case and that a sentence within the Zone A range, which could include home detention or a very short period of incarceration would be appropriate, followed by probation with the requirement that Mr. Nabit, under the supervision of the Probation Department, continue his mental health treatment for so long and in the manner in which the mental health experts determine is necessary.

Respectfully submitted,

*/s/ Steven A. Allen*
Steven A. Allen (Federal Bar No. 00607)
sallen@pklaw.com
Aidan F. Smith (Federal Bar No. 29312)
asmith@pklaw.com
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD 21204
410-339-6779
410-832-5602 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of June, 2021, the foregoing was served upon counsel for the United States via electronic filing and by email.

*/s/ Steven A. Allen*
Steven A. Allen (Federal Bar No. 00607)