**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. GLR-21-0038** |
| **v.** | * | |
| | * | |
| **CHARLES NABIT,** | * | |
| | * | |
| **Defendant.** | * | |

*******

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through its attorneys, Jonathan F. Lenzner, Acting United States Attorney for the District of Maryland, and Mary W. Setzer and Daniel A. Loveland, Jr., Assistant United States Attorneys, respectfully recommends that, in light of the factors set forth in 18 U.S.C. § 3553(a), the Court impose a sentence of thirty six (36) months on Count One of the Information, charging Transportation of an Individual to Engage in Prostitution, in violation of 18 U.S.C. § 2421. The Government also respectfully recommends that a term of supervised release of three (3) years be imposed. The Government will also be requesting restitution in the amount of $250,000 total for the victims. In support of its recommended sentence, the Government states as follows:

### I.       Introduction

On June 5, 2020, the Honorable Charles B. Day issued a Criminal Complaint and arrest warrant for the defendant, Charles Nabit, charging him with Use of Interstate Facilities to Promote a Business Enterprise Involving Prostitution Business, in violation of 18 U.S.C. § 1952. The Criminal Complaint referenced the defendant's conduct with regard to Victim 1, Victim 2, Victim 3, and Victim 4. On June 10, 2020, the Defendant was arrested and had his initial appearance on the Criminal Complaint.

On February 26, 2021, a Criminal Information was filed, charging the defendant with Transportation of an Individual to Engage in Prostitution, in violation of 18 U.S.C. § 2421.  On April 9, 2021, the defendant had his initial appearance and arraignment on the Information, and pled guilty, pursuant to a plea agreement, to the sole count Criminal Information.  Pursuant to his plea agreement, the defendant admitted to facts relevant to his conduct towards Victim 1, Victim 2, Victim 3, Victim 4, Victim 5, Victim 6, and Victim 7.

The plea agreement provides that both the defendant and the Government reserve the right to advocate for a sentence they feel is reasonable.  Sentencing is set for June 24, 2021 at 9:30 a.m. For the reasons set forth below, a sentence of thirty-six (36) months of incarceration is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. 3553(a).

## II.      Sentencing Procedure

In *Gall v. United States*, the Supreme Court set forth a multi-step process for imposing a sentence in a criminal case.  552 U.S. 38, 51–52 (2007).  Under *Gall*, a sentencing court should begin by correctly calculating the applicable sentencing range under the advisory sentencing guidelines.  *Id.* at 49.  After providing the parties with an opportunity to present argument, the district court should then consider the factors set forth in 18 U.S.C. § 3553(a).  *Id.* at 49–50; *see also United States v. Diosdado-Star*, 630 F.3d 359, 363–65 (4th Cir. 2011).  The § 3553(a) factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and purposes of sentencing, such as deterring future crime, protecting the community, reflecting the seriousness of the offense, imposing respect for the law, and providing just punishment.

## III.     Applicable Sentencing Guidelines Factors

As described in Paragraph 7j of the plea agreement, the parties anticipated that the final adjusted offense level would be 13.  Paragraph 10 of the plea agreement makes clear that the

parties are permitted to advocate for a sentence they each feel is reasonable. Furthermore,

paragraph 17 of the plea agreement states as follows:

> The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. **The Court is not bound by the Sentencing Guidelines stipulation in this Agreement**. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. **If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement**. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

The Pre-Sentence Report computes that the defendant's final adjusted offense level is 15.

*See* PSR ¶ 64. A final adjusted offense level of 15 and a Criminal History Category of I results

in a guideline range 18-24 months.

While the parties agreed in the plea agreement that no other potential guideline

"departures" set forth in the United States Sentencing Guidelines would be raised by the parties to

raise or lower the U.S.S.G. range, the parties are each free to ask for a guideline "variance," that

is, a sentence above or below the guideline range determined by the Court. The Government's

recommendation of thirty-six months is made in consideration of all of the 18 U.S.C. 3553(a)

factors and taking into account everything about the nature and circumstances of the defendant's

conduct. This would have been the Government's recommendation regardless of what the

Presentence Report calculated the U.S.S.G. guidelines to be.

The defense will likely not explicitly request a downward *departure* asking the Court to

officially lower the U.S.S.G. range, as paragraph 9 of the plea agreement prohibits them from

doing so, but the Government anticipates that a downward variance from the guidelines may be

requested by the defense, and reference may be made (either explicitly or implicitly) to the defendant's status in society, including his participation in various charitable endeavors.

Therefore, the Government finds it relevant that U.S.S.G. § 5K2.0(d) enumerates multiple grounds which are inappropriate for a downward departure from the guidelines. These grounds include, *inter alia*:

> (1) Any circumstances specifically prohibited as a ground for departure in 5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status)[.]
> (5) The defendant's fulfillment of restitution obligations only to the extent required by law including the guidelines (i.e., a departure may not be based on unexceptional efforts to remedy the harm caused by the offense).
> U.S.S.G. § 5K2.0(d) (emphasis added).

This language is instructive in that it makes clear that these considerations have no place in determining the ultimate sentence for an offender, including the defendant's ability to pay restitution to the victims in lieu of incarceration.

While at first glance, the non-profit and charitable contributions of the defendant may paint the picture of a selfless individual, the Government would note that it was his very stature and notoriety in society that he used as a means of intimidation toward the victims. The victims knew the defendant was well-known and powerful, because he made sure they knew this. As a result, the victims complied with his demands and played into his desire to exploit them. They needed money and drugs, and he knew it.

## IV.    **Nature and Circumstances of the Offenses**

 Attachment A to the defendant's plea agreement contains four pages of facts, outlining some of the defendant's conduct in relation to the charges for which he is being sentenced. While four pages may seem like a lengthy recitation of facts, it does not even represent a small portion

of the defendant's egregious, predatory behavior towards the numerous victims he manipulated and saw for commercial sex.

The defendant is not charged with the crime of "sex trafficking" and has not *admitted* to conduct amounting to sex trafficking; however, it is both permissible and imperative that the Court consider the full context of the defendant's behavior when fashioning a sentence. The defendant specifically preyed on lower class females with drug addictions and other vulnerabilities. The victims came into his orbit because they were desperate for money to support their addictions. The defendant's wealth was inexhaustible, and he used it to keep the victims doing whatever he wanted them to do, even though he knew that this meant that they would not be healthy and sober.

Any attempt for the defendant to mitigate his conduct by claiming that he had a measure of personal affection for these victims outside of the commercial sex acts should be disregarded by the Court, as it is inconsistent with the evidence. The defendant berated, degraded, and manipulated the victims

Victim 1 expressed that the defendant was very verbally and sexually aggressive towards her, and despite her being in tears on at least one occasion, the defendant did not stop. She indicated, "he wanted his way with you" and stated that the defendant had a very "temperamental side" and that the defendant would tell her how he was being good to her, and expect things from her in return. Victim 1 recalled being filmed many times by the defendant during the sex acts. She was able to describe the Go Pro cameras that he used, and noted that the defendant would make sure to film the victims in a manner that showed their faces.

Victim 5 discussed her struggles with drug addiction ███████████████████ The defendant told Victim 5 that she "had daddy issues." During a brief period of time, Victim 5 was in recovery from her drug habit. The defendant refused to see her during that period of time

and would only see her when she was using drugs again. The defendant only wanted to engage in commercial sex with people who had an addiction to hold over their heads. The defendant was forceful and degrading to Victim 5, has threatened Victim 5 and grabbed her by her arms in a forcible manner while she was at his office to engage in commercial sex. The defendant filmed the commercial sex acts with Victim 5 with a Go Pro camera, despite Victim 5 expressing to the defendant that she was uncomfortable with being filmed.

Victim 7 repeatedly discussed her drug addiction with the defendant in text messages, stating on May 18, 2018, "Every addiction counselor I've had, my psychiatrist, and even my sponsor all told me  I would never stay clean as long as I stayed with you."  Victim 7 told the defendant, "You help me out so much but then beat me up for even more after and it makes me feel like shit.  Our relationship is nothing but chaos."  Victim 7 told the defendant that even her mom says that the defendant was a big factor in her using drugs "Because of what our relationship is and because I care what you think more than almost anybody else, you have the power to hurt me more than anybody else"; Victim 7 wrote, "No you are not 'the' reason I use, but you have been one reason. And I've tried to tell you that I wanted to part ways and you just told me that I was hormonal during my pregnancy and then just kept saying that you loved me and didn't want to lose me."

On July 6, 2018, the defendant told Victim 7 that she has "fucked up big time" and called her a "Loser."  On July 11, 2018, the defendant told Victim 7, "even though you are a great fuck, you are a lying sack of shit.  I hate you [Victim 7]."  He writes, "If I knew where you are (in W Balto with your colored friends no doubt0 I would come do a citizens arrest on your scrawny ass myself."  He continues, "You're a low life lying sack of shit. I hope you are enjoying the spade

you are fucking now. I meant what I said about making a mold of your pussy. The rest of you isn't worth a shit!"

On August 13, 2018, Victim 7 told the defendant that she filled out an application for Mountain Manor treatment center, and the defendant replies, "As you recall, I used to own MM and my ex-partner still does." On August 14, 2018, Victim 7 told the defendant that she was going to drug rehabilitation in New Jersey and says it will "give me a break from Baltimore." The defendant stated in response, "I don't get laid before you go though. That sucks." The defendant called Victim 7 a "Sicko bitch" and then thirty minutes later wrote, "Hey love." Victim 7 replied, "What? First I'm a sicko bitch and now I'm your love." The defendant replies, "Times change."

There are numerous text messages between the defendant and Victim 7's mother discussing the defendant fathering a child of Victim 7. Victim 7's mother told the defendant that she was filing paperwork for guardianship of (Victim 7's child) but that she would say the father is unknown because she did not want to drag the defendant into it. They later discussed child support and having an agreement. In a conversation with Victim 7's mother on February 2, 2019, Victim 7's mother told the defendant that she is having a family conversation and says, "[Victim 7] says she doesn't suck dick…true or false?" and the defendant replies, "She certainly doesn't do it voluntarily and she's terrible at it, so I'll just say no." On May 19, 2019, the defendant and Victim 7's mother again discuss Victim 7's drug addiction. On May 23, 2019, Victim 7's mother told the defendant that Victim 7 overdosed on drugs and is deceased. The defendant has provided some minor financial assistance to Victim 7's mother via Zelle payment transfers.

In the defendant's office, investigators also located printed out, hard copies of e-mail messages dating back to 2014 between the defendant and Victim 7. In an email exchange, the defendant told Victim 7 that he did not want to lose her and Victim 7 responded that she had been

in love with the defendant since the prior summer.  Victim 7 wrote, "You tell me all the time that I don't deserve you, and you're right, I don't! I'm just a fuck up who brings you down, stresses you out, and costs you a lot money."  Victim 7 told the defendant, "**You tell me I'm stupid, I'm just a fuck up, I'm a liar, and tell me that I don't care about myself or about you**." Victim 7 wrote that the defendant tells her to "**go back to being the low drug addicted gutter whore that I was before you met me. I'm sick of that too. That shit hurts**." Victim 7 continued, saying, "I hate being yelled at and talked to down to be made to feel worse about myself than I already do all the time. Love isn't supposed to hurt."

Messages with Victims were also located on the defendant's Apple ipad Pro 4th Generation tablet.  On April 26, 2020, the defendant messaged Victim 1, "Ok [Victim 1's first name] so you sent me the pee video. You're right, it wasn't that exciting. I just wanted you to make it because you didn't want to. Next time I'll ask you to take a dump. Never mind I don't want to see that. Maybe a carrot up your ass."   Victim 1 told the defendant that she would send him a video of herself and her friend and wrote, "So it should cover the videos I owe you plus you should compensate me extra because it's extremely worth it"; Victim 1 sent the defendant the video and the defendant responded, "That's all you do? Suck that darkie's dick while he talks spade to you?"; The defendant wrote, "That's no mixed dude. That's a gangsta"; The defendant stated, "You said he was mixed. What bs. He's a straight up black guy. He's your new pimp? Clearly he's controlling you" The defendant told Victim 1 he would Cashapp her $40 if she sent him the rest of the video.

Also located on this device were messages between the defendant and Victim 5 from the Spring of 2020. Victim 5 said that she was sick and wrote, "I NEED TO GET WELL" and the defendant responded, "Does that mean you're still coming or not?"  Victim 5 wrote, "You always treat me how you want because you have money."

### A. The defendant had knowledge of the victims' drug addictions & vulnerabilities, despite what he previously told federal investigators

On December 9, 2019, the defendant met with federal investigators at the United States District Courthouse in Baltimore, pursuant to a grand jury subpoena. Pursuant to a proffer agreement, the defendant provided a voluntary pre-grand jury interview, which his attorney was present for. Ultimately, the Government was not permitted to put the defendant in the grand jury for his testimony, because the Government knew at the time that he was being untruthful to prosecutors in his interview, and strongly believed he would perjure himself before the grand jury.

In this interview, the defendant was asked about victims 1, 2, 3, and 4. The defendant first stated that he had no idea that any of the victims he was asked about were drug users. The defendant then stated that he knew victim 4 was a drug user. He was asked repeatedly about the victims' drug use, and the defendant continued to insist that he had no idea that the young women were drug users, except for victim 4. When asked to avoid technicalities and clarify whether he "thought" or "would not be surprised if" the women were drug users, the defendant gave a small concession in that he would "not be surprised if the girls abused drugs." He then boasted that he had been the owner of Mountain Manor drug treatment facility for ten years, so he "would have been able to recognize drug use." Prior to this statement, the Government was not aware of the defendant's involvement with Mountain Manor.

The defendant was confronted with a text message from Victim 2, asking the defendant to "send 60 so my girl can get girl." The defendant denied knowing what the term "girl" referred to, which refers to Cocaine.

Other messages obtained throughout this investigation reveal the following regarding the defendant's knowledge and exploitation of the victims' vulnerabilities due to drug addiction:

- On November 21, 2018, Victim 2 wrote to the defendant "goin yo rehab I fucked up wont gra from me for 6m" and requested $60.00 from the defendant. Victim 2 sent another message the following day, saying "rehab please." Victim 2 stated in another message with a request for money, "I know I b.s. but I'm in serious fukin danger a."
- On December 21, 2018, the defendant wrote to Victim 2, "You know it's too bad you kept acting like an addict instead of being cool."
- On December 26, 2018, Victim 2 texted the defendant about trying to get back to "Annapolis sober living."
- On May 4, 2020, Victim 2 requested $10 from the defendant via Cashapp for "blunt n love."
- On May 4, 2020, Victim 2 sent another message requesting $10 from the defendant and wrote "blunt. Face time tonite !!" This message suggests that Victim 2 was offering to do a video call with the defendant, presumably sexual in nature, in order to receive money for drugs. This is corroborated by other messages sent by the defendant to Victim 6. On April 23, 2020, Victim 6 requested $200 from the defendant via cashapp. The defendant sent her $1.00, with the message "we need to FT if you want money." Approximately two hours later, the defendant sent another $1.00 to the Victim and wrote "seriously, FT me if you want love, peace, + $$." Similarly, the defendant sent Victim 2 $30.00 on March 26, 2020 and said "a bubble bathn n blunt n facetime u."
- On March 3, 2020, the defendant sent Victim 1 another $1.00 and said, "quit using drugs!" It should be noted that this message was sent less than three months after the defendant met with investigators and indicated that he was not aware that Victim 1 was a drug user.
- On March 6, 2020, Victim 2, who the defendant admitted he knew was a drug user, requested $20 from the defendant for "outpatient program." The defendant refused the request.

Additionally, there are multiple messages where victims ask the defendant for money for food or shelter, and indicate they are "starving." On April 15, 2019, Victim 3 requested $20 from the defendant and stated, "food starving." The defendant refused the payment. Victim 3 then sent another request, writing "food." The defendant refused payment.

- On June 4, 2019, Victim 1 stated "we're headed to you pls can we eat."
- On January 26, 2020, Victim 1 requested $35.00 from the defendant and stated, "I'm sorry chuck. I know you hate me." The defendant refused payment of the requested $35 to Victim 1, sent her just $1.00 and said "you're right. Go the F away loser." He then sent another $1.00 to Victim 1 and said "I had $500 for you if you showed up. Not now." Victim 1 replied, "chuck please its cold."

- On May 19, 2020, Victim 1 requested $40.00 from the defendant, and said "I sent the video."
- On May 23, 2020, the Defendant paid Victim 6 $100.00 and said "incentive to keep FT me!" On June 7, 2020, just 3 days prior to his arrest in this case, the defendant sent Victim 6 $1.00 and said "the last dollar you get from me. you're history." This was followed by the defendant sending Victim 6 another dollar, and telling her "you're a dumbass." Victim 7 then requested $50.00 via cashapp and said "I'm not gonna stop until in not hungry anymore." The defendant replied, "no text, no call, no FT, no respect, no $, sorry." The defendant sent Victim 6 another dollar and said "don't be an ingrate. If you do, you lose."

From the Cashapp records, it is clear that the defendant was willing to pay these vulnerable, drug-addicted victims money, but he required something from them in return. The defendant knew the victims were desperate for money for drugs, food and/or shelter. This made him valuable to them and played into his desire to control and exploit them for his own benefit. Another point that is abundantly clear from the messages is that the defendant required something from the victims in order to give them money. He required them to do "sexy facetime" with him, to engage in commercial sex with him, and/or to allow him to film them. The victims were in an impossible position, and he knew it. The defendant's manipulative and malevolent conduct is further demonstrated by his repeated payments of just a single dollar at a time to several of the victims until they met his demands. The defendant was trying to remind the victims he was available, and had the money, but they just had to do what he wanted.

The defendant is not a benevolent, charitable man who made a few bad choices ███████ ███████████ as he would likely have this Court believe. He is the man who specifically sought out young women who were in need. The first step in the grooming process is spotting vulnerable victim. Someone who is in need of something, financial or otherwise. They identify that need and then they exploit it. The defendant is a multi-millionaire, and he made this known to the victims.

On January 22, 2020, the defendant sent a Cashapp message to Victim 1 with $1.00 and said "[Name of Victim 1] please call me. I want to see you." Just one minute later, the defendant

also sent a Cashapp message to Victim 6 and paid her a single $1.00, "[Name of Victim 6] please contact me. Chuck." Five minutes later, the defendant sent another message to Victim 1, with another $1.00 and said, "there's $499 more waiting for you." The defendant repeatedly sent the victims a single dollar to taunt them and remind them that he had more money for them if they did what he wanted.

On June 10, 2020, law enforcement executed a warrant for the defendant's arrest and a federal search warrant to search his person, his office located at 20 Commerce Street, and his vehicle. While the defendant was being transported to the federal courthouse, he stated that when he previously met with agents he was "scared to death" but after the meeting he thought everything was good. He stated he had not "done anything" since then (referring to commercial sex and the activities he was asked about during his December 2019 interview with investigators). The defendant also stated, "this is an attempt to destroy my family." The defendant lied to investigators about not having engaged in commercial sex with the victims since his December 2019 meeting, and he essentially claimed that _he_ was being victimized by authorities.

Multiple Go Pro cameras were recovered from the search of the defendant's office. The recordings recovered thereon are further proof of the defendant's treatment of the victims.

In a Go Pro recording from June 2, 2017, the defendant joked that he "would still fuck" Victim 7 if she died because "don't want a warm corpse to go to waste." In another recording, the defendant talked about an occasion that he had sex with Victim 7 when she was asleep. In multiple recordings, Victim 7 indicated that she does not like the cameras and says she is going to break the camera one day. The defendant replied that he has three more. In another recording, while engaging in commercial sex with the defendant, Victim 7 stated that she had to stop because she was going to have a heart attack and die. The defendant replied that he does not want that to

happen to her or happen there, while joking that he would have to cut her up in pieces and take her out if she died at his office. Victim 7 complained that her breathing was getting worse, and the defendant replied that he did not want her to choke and die, "but a little choking is ok" and continued engaging in sex with Victim 7. On one occasion, Victim 7 refused to engage in oral sex with the defendant, and he replied, "since when has that ever stopped me?"

In a Go Pro recording from June 17, 2019, after engaging in sex with Victim 6, she asked the defendant whether he has any Cocaine and whether he can get her a line, but not a huge one. The defendant said that he "takes care of his girl." The defendant then appeared to pour out a white powdery substance, which Victim 6 snorted.

During a conversation with Victim 6, she was asked by the Government how she first found out about the defendant's arrest.[1] Victim 6 stated that she was "watching the Jeffrey Epstein documentary and it made her think of Nabit." Victim 6 then Googled his name and saw articles about his arrest.

## V.     Purposes of Sentencing

### A.     A substantial sentence is necessary to reflect the seriousness of the offenses, to provide just punishment, and to promote respect for the law.

Human trafficking is inherently a crime of exploitation and often dehumanization. While the defendant was not charged with the technical crime of human trafficking, the defendant likewise exploited and dehumanized his victims in a way that other commercial sex *customers* do not. The defendant was *not* merely engaging in commercial sex to feed some sexual need in the moment. The defendant communicated with the victims outside of the timeframe of the sex dates, tantalizing

---

[1] Victim 6 was not referenced in the original criminal complaint first charging the defendant, and was first interviewed after his arrest.

them with his ability to provide them extra money which they so badly needed to support their drug addictions, to put food in their stomachs, and to maintain safe shelter.

The individuals who traffickers exploit are known as "victims" in the criminal justice system because they have been harmed during the commission of a crime. The defendant similarly harmed and exploited numerous vulnerable young women.

In 2020, the top victim vulnerability in active sex trafficking cases was substance dependency, with 38% percent of sex trafficking cases prosecuted federally involving substance dependency of the victims. *See*, 2020 Federal Human Trafficking Report, https://www.traffickinginstitute.org/wp-content/uploads/2021/06/2020-Federal-Human-Trafficking-Report-Low-Res.pdf, at page 28. This, unlike some of the other common victim vulnerabilities such as prior incarceration, involves an *active, ongoing vulnerability* and impairment of the victim. This is precisely how Nabit was able to use his money as a carrot for the victims to chase after in order to satiate their drug addictions.

Furthermore, the 2020 Federal Human Trafficking Report analyzed the common tactics used to recruit vulnerable victims into commercial sex work. The top methods of recruitment in 2020 active sex trafficking cases were fraudulent job offers and feigned romance. Recruiters also promised victims shelter, material possessions, transportation, drugs, gang membership, recovery from substance dependency, money, tattoos, and education. *Id*. at 45.

Again, while the defendant has not admitted to human trafficking, this list demonstrates the correlation between his grooming, manipulation, and extortion, and that of traffickers. The list demonstrates that, despite what the defendant may try to have the Court believe, his conduct was substantially more egregious than that of a typical commercial sex customer.

Should the defendant claim that he has already suffered sufficient punishment weighing against incarceration in part due to any media attention surrounding this case and his resulting "fall from glory," that would demonstrate a lack of true focus on the impact his conduct has had on the victims.

The defendant was served with a federal grand jury subpoena, and he thereafter continued meeting with victims for commercial sex and continued mistreating them as described *supra* in this memorandum. The defendant then appeared at the federal courthouse in Baltimore and met with multiple federal investigators in the context of an official federal sex trafficking investigation, and he thereafter continued meeting with victims for commercial sex and continued mistreating them.



**B.** **Impact on the Victims**

Victim impact statements will be provided to the Court separately from this Memorandum.

**C.** **The need for deterrence**

The Government charged this defendant after he lied to investigators in a federal investigation (despite his continued unwillingness to acknowledge that) because even a powerful person must be held accountable for his impactful, heinous actions towards those who are voiceless. This Court must send a message to the community that the judicial system is not one of "Money. Power. Privilege. Rinse. Repeat." Even those who are accustomed to successfully bullying others outside the courtroom to get what they want in life, will not be able to throw money around within the courtroom in order to justify a variant sentence below the sentencing guidelines, which are presumed reasonable.

## VI.   <u>Restitution Requests for the Victims</u>

Awarding restitution in human trafficking and related cases is especially essential because victims often leave these situations with few or no resources with which to rebuild their lives.

As identified in the 2020 Federal Human Trafficking Report referenced above, the amount of victim restitution ordered per human trafficking case in 2020 ranged from $40 to $3,100,917, *averaging* $320,831 per human trafficking case. 2020 Federal Human Trafficking Report, https://www.traffickinginstitute.org/wp-content/uploads/2021/06/2020-Federal-Human-Trafficking-Report-Low-Res.pdf, at page 105.

Pursuant to paragraph 11 of the plea agreement in this case, the defendant has agreed to the entry of a restitution order for the full amount of the victims' losses. The defendant *specifically agreed that this restitution could include medical bills and counseling costs (including travel) for any of the victims*, "if any such costs exist **or are reasonably projected**."

Further, "[a]bsolute precision is not required when calculating the proper amount of restitution." *United States v. Johnson*, 680 F. App'x 194, 200 (4th Cir. Feb. 28, 2017) (unpublished) (internal citation omitted). Rather, "the government must establish the amount of

the victim's loss with reasonable certainty." *Id.* (internal citation omitted). *See also In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012).

In calculating loss, "a district court 'may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy.'" *United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010) (quoting U.S.S.G. § 6A1.3(a)). *See also United States v. Singletary*, 649 F.3d 1212, 1217 n.21 (11th Cir. 2011). The evidence used by a court to determine restitution can include grand jury testimony. *Unites States v. Nash*, 558 F. App'x 741, 742 (9th Cir. Feb. 27, 2014) (unpublished); *Sealed Case*, 702 F.3d at 67.



██████████████████████████████████████████████████

████████████████████████████████████████ This money will

give the victims the gift of life, a gift Victim 7 no longer has due to her drug overdose on May 23,

2019, less than two months after the defendant was telling Victim 7's mother that her daughter had

"seemed to handle the crack ok for weeks."

The Court should further order that the restitution be due "in full immediately" and pursuant

to a payment schedule that is consistent with the Defendant's finances. As to the "in fully

immediately" order, Congress has expressed a preference through statute that restitution be

payable immediately. *See* 18 U.S.C. § 3572(d)(1). This statutory preference is consistent with the

Crime Victims' Rights Act mandate that victims receive "full and *timely* restitution as provided in

law." 18 U.S.C. § 3771(a)(6) (emphasis added). Restitution orders that are payable in full

immediately allow the Government to use its full array of tools to ensure that victims receive

restitution in a timely manner.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

**VII.** <u>**Conclusion**</u>

WHEREFORE, for the reasons stated herein, the Government respectfully requests that the

Court impose a sentence of sentence of thirty-six (36) months of incarceration on Count One of

the Criminal Information. The Government also respectfully recommends that a term of

supervised release of three (3) years be imposed on Count On, and that Restitution be ordered as delineated above.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

By:  *Mary W. Setzer*
Mary W. Setzer
Daniel A. Loveland, Jr.
Assistant United States Attorneys