# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| Plaintiff | * | |
| v. | * | Case No. 21-cr-38-GLR |
| CHARLES NABIT | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT CHARLES J. NABIT'S (REDACTED) REPLY MEMORANDUM TO GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Charles J. Nabit, by Steven A. Allen and Aidan F. Smith, in Redacted Reply to the Government's Sentencing Memorandum says:

The Government is treating Charles Nabit as something he is not. He has never been a sex trafficker. He never forced a woman to become a prostitute, nor ever trafficked a sex worker to others for commercial sex. He obtained no financial benefit, as sex traffickers do, from the activities of the women. These are irrefutable facts.

The Government wants the Court to inordinately punish Mr. Nabit for being a customer, a "John," of women who were sex workers before ever meeting Mr. Nabit and offered and provided commercial sex services to many customers, not just him. The Government is seeking for 36 months incarceration even though Mr. Nabit was solely a customer for the reasons fully explained in the reports of Dr. Chris Kraft and Michael Wall, LCSW-C. For a year he has successfully participated in extensive psychotherapy to address the root cause for his using the services of professional prostitutes so that he will not engage in that behavior again.

A recurring theme in the Government's Sentencing Memorandum is that Mr. Nabit should be singled out for special treatment because he has been a successful businessman and is wealthy. It is correct that he is a successful businessman, but for decades, he has used that success and his wealth to better the community through many years of valuable community service and charitable activities.

The fact that in addition to paying the sex workers for services when they were rendered, Mr. Nabit also gave them money in response to their numerous and frequent requests for money is no basis for the sentence the Government is seeking. Except for responding to a few requests for $10 or $20 from one woman for a "blunt," a marijuana cigarette, decriminalized in Maryland and not a hard drug, he did not give the women money intending that they use it to buy drugs.

When the women asked for money, they frequently claimed a need for money for many legitimate reasons. He gave them money in response to many of those requests, after which he had no control over how they used it. If a woman used some of the money she earned providing commercial sex services, or money he gave her for the purpose of buying drugs, he is not responsible for that. Just like other customers, Mr. Nabit is not responsible for how the women use their money.

Alleged sex trafficker De'Angelo Johnson used force, violence, threats of violence, and drugs to compel women to be prostitutes and marketed them, as reflected in the heart-wrenching victim impact statements of R.H. and her mother. But that is not chargeable to Mr. Nabit. Mr. Nabit neither knew nor ever dealt with Johnson. In fact, the victim impact statements of R.H. and her mother do not make any mention of Mr. Nabit.

The Government erroneously claims that Mr. Nabit manipulated and exploited the professional prostitutes from whom he purchased sexual services, however, the Government, other

than throwing stones at him for his generosity, does not provide a cogent explanation for that allegation. Mr. Nabit was a "John," a customer, of sex workers who offered and provided sex services to many customers. He responded to their frequent requests for money, which, had he not, they surely would have found other ways to obtain. R.H., in her victim impact statement attests to unfortunately being present at the time of robberies and gun violence, presumably against customers, not an infrequent occurrence of sex traffickers and prostitution. Mr. Nabit was never involved in any such conduct.

The Government's claim in its Memorandum that Mr. Nabit used his status in the community to bully vulnerable women is not supported by the evidence. Mr. Nabit was a prominent member of the community. The last thing in the world that he would want is for a prostitute to know his status, so that she could blackmail him. The argument from the fertile imagination of the Government at first blush sounds good, but upon close examination is a non-sequitur. The truth is, had he told the women that, he would have made himself a prime target for threats that they would go public about his involvement with prostitutes. The claim, like others made by the Government, is without merit.

The Government has issued press releases and made public pronouncements associating Mr. Nabit with sex trafficker Johnson, creating the public image of Mr. Nabit as being a sex trafficker. The Government's association of Mr. Nabit with Johnson and asserting that Mr. Nabit is a sex trafficker has destroyed Mr. Nabit's standing in the community, well-earned from his decades of community service and charitable acts.

Sex trafficking is rampant in this city, particularly on the Block where most of the sex workers in this case provided their services out of back rooms made available by the bars to sex

workers to ply their trade. While the Government turns a blind eye to those sex traffickers, it vigorously goes after Mr. Nabit, low hanging fruit.

The Government's claim that Mr. Nabit groomed the professional prostitutes is wholly without merit and misapplies that concept to this case. Grooming is a concept in child molestation cases where adults employ a process of gradually introducing and desensitizing an innocent child to sex to cause the child to accept sexual contact from an adult. None of the professional prostitutes in this case were innocent children. Each was an adult. Every one of the adult women was a sex worker before meeting Mr. Nabit. Mr. Nabit never groomed anyone.

Mr. Nabit met four of the women, Victim 2, S.G., Victim 4, N.H., Victim 5, K.M. and Victim 7, A.C., when they were working in bars on the Block, offering and having commercial sex with customers in back rooms provided by the bars. He was introduced to R.H. by S.G., one of the prostitutes Mr. Nabit met on the Block. After R.H. had a sexual encounter with Mr. Nabit, she brought her girlfriend, E.D., to Mr. Nabit's office for a sexual encounter. Thereafter, he had sexual encounters with both R.H. and E.D. Victim 6, A.N., the woman who is the subject of the offense of conviction, but is only mentioned in one paragraph of the Government's 21 page Sentencing Memorandum, advertised her services and sought customers using the internet.[1]

The difference between Mr. Nabit, and other customers of the women was that the street smart professional sex workers recognized that Mr. Nabit had money, and had become emotionally attached to them, used that attachment to get extra money from him, through repeated requests for financial help. Mr. Nabit was an easy target. The women knew what buttons to push to get money

---

[1] In addition to his office, Mr. Nabit had a sexual encounter with R.H. and E.D. at the Woodspring Suites Hotel in White Marsh, where they provided services. On that occasion Mr. Nabit used his credit card to pay for a single day use of a room reserved by R.H. After Mr. Nabit left, the two women continued to use the room, during which they caused damage to the room and from which a television was stolen. Woodspring Suites assessed $1,800 in charges the women ran up against Mr. Nabit's credit card, including to repair the damage and for the television. *See* **Exhibit 1**, e-mail and Woodspring charges.

4

from him, including telling him things like "I love you" and "love" and using emojis of hearts and smiley faces with messages. If there is one thing we can all be sure about, sex workers know how to get extra money from customers.

Mr. Nabit, as the Government reluctantly admits, has not been charged in this case with sex trafficking. That is because he was never a sex trafficker. Yet, at page 13 of its Memorandum the Government ignores that irrefutable fact by claiming that although he was "not charged with the technical crime of human trafficking," he should be treated as a sex trafficker. Not only has Mr. Nabit never engaged in the "Technical crime of human trafficking," he has never been involved in the figurative form of sex trafficking, or any other kind of sex trafficking. He never trafficked women for his financial gain. Merely because one is a generous customer does not make a customer a trafficker. Unlike sex traffickers, Mr. Nabit never forced a woman to become a prostitute, nor ever sold or caused a woman to sell herself to others.[2]

Mr. Nabit cared for the women. Unlike many other customers of professional prostitutes, he was never violent with any of the women. The Government has hours of Go Pro videos – there is no evidence of violence on any of them. The victim impact statement of R.H., which does not even mention Mr. Nabit, is solely directed at De'Angelo Johnson, and says nothing about any physical abuse by Mr. Nabit. There are no text messages from any of the women complaining that Mr. Nabit abused or was violent with them. Surely, if there were any, the Government, who

---

[2] Undersigned counsel has learned that letters being sent by the Government to obtain victim impact statements characterize the charge against Mr. Nabit as "Civil Rights – Slavery/Involuntary Servitude." Those letters are now out in the public domain. The Government is leaving no stone unturned to destroy Mr. Nabit's reputation in the community, accusing him of sex slavery and involuntary servitude.

Undersigned counsel has even learned that when one of the persons who was contacted by the victim witness person from the United States Attorney's Office said positive things about Mr. Nabit, that person was told that those things were not true. The individual told the victim witness person not to try and put words into their mouth. Of course, the Government has not produced information about any positive verbal comments received from that person or any other person because they contradict its theory in this case.

5

reviewed the text messages with a fine tooth comb, and cherry-picked what it considered most supported its thesis, would have highlighted them in its Sentencing Memorandum. The jocular repartee from a Go-Pro video between Mr. Nabit and A.C., referenced by the Government on pages 12-13 of its Sentencing Memorandum is nothing more than that. It is the type of "gallows humor" people who are very familiar with each other frequently exchange.

Mr. Nabit always paid the women from whom he purchased sexual services – he never stiffed them as many customers do. In contrast to other customers, however, he was frequently there for them when they told him they needed financial help.[3]

There is no good reason for the Government to mount such a vicious attack against Mr. Nabit. There is no legitimate basis for the Government to claim that he should be treated in the same manner as a pimp and trafficker who forces women into prostitution and manages and benefits financially from their work.[4]

---

[3] Examples of some of the instances where Mr. Nabit sent money to the sex workers via Cash App, Venmo and similar means to help with their personal needs included sending money to Victim 2, S.G., when her mother died, to help with costs associated with the funeral, including the cost of flowers.

When Victim 5, K.M.'s father died, Mr. Nabit gave her money so she could buy an urn and paid miscellaneous expenses. He also helped her pay for car repairs and tires, and after she left an abusive boyfriend, Mr. Nabit gave her money to help her with rent and living expenses.

As noted in the Defendant's Sentencing Memorandum, Mr. Nabit gave A.N. thousands of dollars after she moved to North Carolina and after their last sexual encounter in late January 2020, which included money to buy a car, pay rent after she moved out of her parents' home, food and incidentals.

Mr. Nabit gave R.H., E.D. and N.H. money when they requested it for food, hotel rooms, medicine and other expenses.

He gave a lot of money for years to Victim 7, A.C., to help pay her living expenses during times she was not living with her parents, to help her with automobile expenses, medicine and other things. Even though, as discussed below, he was not the father of A.C.'s child he gave her money after the child was born to help with expenses and has been sending money monthly to A.C.'s parents who took custody of A.C.'s child. He sends the money because he cared about A.C. and they can use it in caring for A.C.'s child. He does this because he had an emotional attachment to A.C.

[4] Of note, there is not a single reference in the Government's Sentencing Memo to a case in which a Defendant who was solely a customer has been prosecuted by the federal government for being a customer. There are also no cases referenced in the Government's Sentencing Memorandum where a customer, since 1986, has been prosecuted

Contrary to the Government's claim, there is no evidence that Mr. Nabit preyed upon "lower class females with drug addictions and vulnerabilities," a handy phrase. He met women in bars on the Block where they worked, was introduced to R.H. by a woman he met in a Block bar, and by R.H. to E.D. Several of the women advertised on the internet. All were offering sexual services to whomever was willing to pay for them. The women pretended to be attracted to Mr. Nabit, showed him affection, and he became enthralled by the attention which the women knew how to use for a maximum return from their customer, Mr. Nabit. He did not go trolling for what the government euphemistically calls "lower class females."

The Government knows that each of the women for whom Mr. Nabit was a customer became a commercial sex worker for reasons wholly unrelated to Mr. Nabit. At least some are still involved in prostitution. Victim 4, N.H., the subject of Exhibit 3 of Ms. Wong's report, is currently advertising her services on the internet. **Exhibit 2**, Early June 2021 Ad.

There are many reasons why a woman becomes a prostitute. Some women become prostitutes because it is a way to make money. Some women become prostitutes because it is more lucrative than working at a minimum wage or low paying job. Some women become prostitutes because a boyfriend or significant other caused them to become addicted to drugs and/or put them out on the street. Some women become prostitutes because, as Government expert Wong notes in Exhibit 3 of her report about N.H., they are sexually abused or molested as a child and/or because of some other trauma they develop psychological problems. Tragically, as was the case with R.H., some women become prostitutes because a sex trafficker like Johnson forces them into it for the sex trafficker's financial benefit.

---

under The Mann Act for taking a trip with an adult woman who he did not traffic. That is because such prosecutions by the federal government virtually never occur.

It is truly unfortunate that R.H. did not tell Mr. Nabit that she had been forced into being a prostitute and wanted out. Johnson has been in jail since May 23, 2019, yet she continued to engage in prostitution after he was locked up. There is no doubt that had R.H. asked for help from Mr. Nabit, who throughout his life has helped people, he would have tried to help her.

Mr. Nabit should not be singled out because he is wealthy. The fact that he was in a position to give the women money in response to the numerous requests for money he received from them was not exploiting them. Because of his psychological and emotional disorders diagnosed by Dr. Kraft and Mr. Wall during a year of intensive psychotherapy, he was vulnerable. The women were street smart and knew they could easily get money from him. He considered them to be friends, and in some cases girlfriends. That is not exploitation by Mr. Nabit.

A very small sample of the many frequent requests Mr. Nabit received from the sex workers are some Cash App requests made by R.H. who after Johnson was jailed, continued seeing Mr. Nabit and repeatedly asked him for money for a variety of reasons. A few of the Cash App payments by Mr. Nabit to R.H. and messages associated therewith include:

- 5/23/19 – $40 paid out by Mr. Nabit to R.H. in response to her message "can't wait for tomorrow" [with two smiley face emojis]
- 5/31/19 –$140 paid out by Mr. Nabit to R.H. in response to her request for money for "medicine"
- 6/2/19 – $50 paid out by Mr. Nabit to R.H. in response to her telling Mr. Nabit "I love you."
- 6/6/19 - $35 paid out by Mr. Nabit in response to her telling Mr. Nabit "you're too good to me" [with smiley face and a heart emoji]
- 1/12/20 - $45 paid out by Mr. Nabit in response to request "please" [with smiley face emoji]
- 1/14/20 - $97 paid out by Mr. Nabit in response to request "I really need a room"
- 1/23/20 - $47 paid out by Mr. Nabit in response to request from R.H. "other half for room only if you can" [with heart emoji]

- 3/16/20 - $1 sent by Mr. Nabit to R.H. with the message from Mr. Nabit to R. H. "quit using drugs"

- 3/16/20 - $80 paid out by Mr. Nabit to R.H. in response to her request "room emergency please"

- 3/17/20 - $60 paid out by Mr. Nabit to R.H. in response to her request "hygiene"

- 5/3/20 - $45 paid out by Mr. Nabit to R.H. several days after receiving a request from R.H. "pretty please I love you" [with lips and heart emojis]"

- 5/5/20 - $113 paid out by Mr. Nabit to R.H. in response to request from R.H., with a heart/love symbol

The Government erroneously asserts at page 12 of its Sentencing Memorandum that Mr. Nabit sent $1 by Cash App to sex workers to "taunt them and remind them that he had more money for them if they did what he wanted." The Government, however, ignores that Cash App can be used to send a message to someone about any subject in the same manner as a text or email. However, to send a message using Cash App, the sender must accompany it with a $1 transfer. There were times when Mr. Nabit sent $1 with messages such as the one to R.H. on March 16, 2020, with $1 telling her to "quit using drugs." There were times when Mr. Nabit sent $1 with messages because he was concerned about a woman he had been unable to contact. Defendant admits that at times he used Cash App messaging to set up a date with a sex worker at which he would pay her.

### Mr. Nabit's December 9, 2019 Interview By The Government

As the Government notes at page 9 of its Sentencing Memorandum, Mr. Nabit received a grand jury subpoena in the De'Angelo Johnson case and met with the Government on December 9, 2019. At the time Johnson had already been indicted and presumably the Government was using the Grand Jury to collect information for a possible Superseding Indictment.

At the beginning of the meeting the Government showed Mr. Nabit pictures of R.H., S.G., E.D. and N.H. and asked him whether he ever had commercial sex with them. He truthfully told

the Government that he had.  The Government showed Mr. Nabit a picture of Johnson, who Mr. Nabit said he never saw before.

The Government asked Mr. Nabit to tell it what he knew about Johnson, the subject of the grand jury subpoena and investigation.  Mr. Nabit truthfully told the Government that he had never dealt with Johnson and did not know him.  That has been corroborated by the facts discussed at pages 7 to 10 of the Defendant's Sentencing Memorandum.

The Government's response when Mr. Nabit said that he neither knew nor had dealings with Johnson was to accuse him of lying, which, as the evidence establishes, was not the case.  Mr. Nabit did not have anything to say about Johnson, which was the true reason the Government did not that day put him before the Grand Jury which was investigating Johnson.  It was not, as the Government asserts at page 9 of its Sentencing Memorandum, because "he would perjure himself before the grand jury."  He had nothing he could truthfully say to the Grand Jury about Johnson and the Government knows that.

After telling the Government on December 9 that he had no information about Johnson, the meeting became very confrontational.  In addition to accusing Mr. Nabit of lying about Johnson, the Government accused Mr. Nabit of providing drugs to the prostitutes whose pictures were shown to him.  The Government, as it states at page 9 of its Memorandum, confronted Mr. Nabit with a text message S.G. sent to him which the Government told him proved that he had given money to S.G. to buy cocaine.

The text message is referenced at page 9 of the Government's Sentencing Memorandum.  It was sent to Mr. Nabit by S.G. on March 28, 2019 at 6:59:05 PM.  In it S.G. asked Mr. Nabit to "send 60 so my girl can get girl."  The Government told Mr. Nabit he was lying because "girl" was drug slang for cocaine and told him the text proved he gave money to S.G. to buy cocaine.

Mr. Nabit denied that he sent her money to buy cocaine in response to the text or that he knew girl meant cocaine. The Government grew angrier at him.

What the Government failed to tell Mr. Nabit when they told him he was lying about the text, and what it conveniently omits from its discussion about the text in its Sentencing Memorandum, was Mr. Nabit's response to the S.G. girl text less than a minute after receiving it. Mr. Nabit responded at 6:59:38 p.m. saying "No."

At 7:00:06 p.m., S.G. texted Mr. Nabit saying "40 Atleast I gta pay ride n 20 for my weed lol." At 7:00:14 p.m. Mr. Nabit again responded "no."

At 7:04:40 p.m. S.G. sent Mr. Nabit pictures of a "girl" who she wanted to introduce to him. Mr. Nabit indicated he was not interested. At 7:05:42 p.m., S.G. texted "Ok well that's not the girl I'm wit I just like her, lol I'll send pic of girl I'm wit." After which at 7:07:21 p.m., S.G. sent Mr. Nabit pictures of another girl. Mr. Nabit then told S.G. he would likely not be able to see her that day. At 7:11:37 p.m., S.G. texted "no I need u I have nowhere to go tonite, I need that money for a room."

Mr. Nabit reasonably believed that girl meant a woman, one of the women S.G. sent him pictures of who she wanted to introduce to him.

It is fair to ask why the Government failed to tell Mr. Nabit during the December 9 interview, when it accused him of lying about the text, and in its Sentencing Memorandum, the "no" response from Mr. Nabit to the S.G. girl text, or that S.G. circled back to the request after talking about a girl she was with, saying she needed the money for a room, presumably for her and the woman. The reason the Government ignored the context of the "girl" text is obvious. The string of texts contradict the Government's narrative about December 9, 2019.

## CHERRY-PICKED MESSAGES

The Government claim that Mr. Nabit exploited and dehumanized the women is hyperbole and untrue. Some of the cherry-picked text messages which the Government used in its Sentencing Memorandum contain some boorish language, which the Government has strung together to create an argument that Mr. Nabit should be treated differently than other customers. Although he may have used some coarse language on occasion, many men, both customers of prostitutes and others, use such language from time to time. Moreover, as noted below many of the Government's cherry-picked messages are incomplete and out of context.

The Government has cherry-picked some text messages and emails, taking many out of context to try to paint an inaccurate picture of Mr. Nabit.

At pages 7 and 8 of its Memorandum, the Government references emails from A.C. where she said she had been in love with the Mr. Nabit since the previous summer. That was true and Mr. Nabit cared about her. However, Mr. Nabit was not willing to abandon his family for A.C. She would, at times, become angry with him, which is not an unusual occurrence when someone is in a relationship with a married person. Out of anger, she wrote the email the Government quoted from, "You tell me all the time I don't deserve you," not the first time someone in a relationship has said that to the other person. Because of her involvement with prostitution and failure to stop using drugs Mr. Nabit, at times, used critical and strong language as he tried to get her to stop. He was frequently frustrated and, at times used tough love to try and get through to her, a common human experience.

The Government at page 6 refers to a statement A.C. made on May 18, 2018 that her counselor told her she would never stay clean as long as she stayed with Mr. Nabit. That text by A.C. was part of a string of texts in which Mr. Nabit was trying to get her to go home and stop

using drugs. Assuming, arguendo, that a counselor actually made the statement and that A.C. did not say that to Mr. Nabit to hurt him, he responded "you can try to blame me, this isn't about me. It's about you." It was about her, she would not get and stay clean. In the string he also told her "… I don't want to lose you but I would if it really would help you honestly. I care so much for you. You know this!" Why did the Government omit Mr. Nabit's response and the context?

The texts to A.C. about having "fucked up big time" and "being a loser," referred to at page 6 of the Government's Memorandum, were part of a series of texts involving A.C., her mother, and Mr. Nabit about A.C.'s very erratic behavior, about which they were concerned and her lying about drugs. Here again, the Government omitted language in the text. The text actually said "You have now fucked up big time," a comment about her return to drugs and not a general degrading statement. The Government conveniently omitted "You have now" from the text to give a misimpression of what Mr. Nabit said.

The use of the word "loser," which the Government gloms on to was in the text that immediately followed the "You have now fucked up big time" text. It was part of Mr. Nabit's frustration with A.C. It was tough love, but not language different from what others might say to a person who ignores good advice and help, proceeding on a destructive path.

The July 11, 2018 text referred to at page 6 of the Memorandum is both taken out of context and omits a relevant portion of the text. The Government quotes "you are a great fuck, you are a lying sack of shit." The text actually reads "Reluctantly I just have to conclude that, even though you are a great fuck, you are a lying sack of shit . . ." Mr. Nabit was reacting to her lying to her parents and him. Another instance of the Government using a piece of a text out of context to put

a spin on what Mr. Nabit said in a moment of frustration, to try to make him look like someone he is not.[5]

The reference to the texts from July 6, 2018, referred to by the Government at the bottom of page 6 and the top of page 7 is an inexcusable effort by the Government to play the race card to try to inflame the Court, and, after the press reads the Government's Memorandum, publish the statements for public consumption. There was no legitimate reason for the Government to put the words before the Court.

The texts contain language A.C. regularly used. Mr. Nabit used her language to get through to her when saying "If I knew where you are in W Balto with your colored friends" etc. The words "colored friends" were not redacted by the Government from the text solely for their potential inflammatory and prejudicial effect. Nor was there a reason for the Government to include, at the bottom of page 6 of the its Memorandum, a text with the word "spade," another word frequently used by A.C. in describing people with whom she engaged in commercial sex. Here again Mr. Nabit used her language to try to get through to her. The Government's failure to redact the words, which have nothing to do with this case, shows the Government's desperation to destroy Mr. Nabit.[6]

---

[5] At page 7 of its Memorandum, the Government refers to a text exchange between Mr. Nabit and A.C.'s mother. The mother knew A.C. was a prostitute, and during a conversation with her asked Mr. Nabit a question about what A.C. had told her during a conversation with her mother about A.C.'s sexual activities, Mr. Nabit answered the question. Yet the Government uses the text exchange to denigrate Mr. Nabit.

[6] The Government also cherry-picked a text with R.H. on April 26, 2020 in which Mr. Nabit used the words "darkie" and "gangsta." The Government, however, knows from the evidence that was language R.H. frequently used, which Mr. Nabit adopted in connection with the text. Again, it is only in the Memorandum for its prejudicial effect.

Since counsel expects that the Government will litter its Reply Memo with reference to a piece of paper it seized from Mr. Nabit's office containing the "N" word, thinking that undersigned counsel will not be able to respond, we will address it here. The Government tried to include the paper in the Statement of Facts for its prejudicial effect. Undersigned counsel objected and reminded the Government that R.H. had sent Mr. Nabit a video with an African American man in which the man repeatedly used the "N" word to describe himself. Mr. Nabit is an inveterate note taker and when watching the sex video R.H. sent him made a note about what was said on the video by the man.

Mr. Nabit is not and has never been a racist. Much of Mr. Nabit's community service work has been directed at the citizens of Baltimore City. His current work for Heaven On Earth Now helps people of all races who were previously homeless. His restaurant, Mission Driven Dining, helps with the rehabilitation and re-entry into society of formerly incarcerated persons of all races. Lamont Cousins, who Mr. Nabit has made the manager of his restaurant and given a 10% interest therein, is African American. This is but another example of the Government's bankrupt attempt to convince the Court that Mr. Nabit is someone other than who he truly is.[7]

On page 7, the Government again takes a statement out of context. The Government wrote that when A.C. stated she needed a break from Baltimore, Mr. Nabit "stated in response 'I don't get laid before you go though. That sucks.'" The Government conveniently left out what preceded his statement and what he actually said. A.C. and Mr. Nabit were discussing her going to rehab and also repairs to her truck, including Mr. Nabit picking up the truck from the repair facility after she left, and also when she would be picked up by someone to take her to rehab. His comment, most of which the Government omitted from its Memorandum was "I'll make sure the truck gets picked up. I guess I'm glad you're going to treatment (again) and hope for the best. Better than jail. I don't get laid before you go though. That sucks," referring to the fact that he would not be seeing her before she left. He was not trying to delay her going to rehab as the Government suggests. Why does the Government keep leaving portions out of texts, and taking them out of context except to paint an erroneous picture?

---

[7] When the Government provided counsel with its first version of the Stipulated Statement of Facts the unredacted texts referenced in the Government's Memorandum were in it. Undersigned counsel objected because it was obvious that the only reason the Government wanted them included was for their inflammatory and prejudicial effect. As a result, the texts were removed from the Stipulated Statement of Facts only to reappear unredacted for obviously the same reason in the Government Sentencing Memorandum.

15

The Government's assertion at page 7 of its Memorandum that Mr. Nabit is the father of A.C.'s child not only has absolutely nothing to do with this case, it is not true. It is only in the Memorandum for its prejudicial effect and so the medial will report it.

A.C. became pregnant during the time she was in a multi-month residential drug treatment program, which Mr. Nabit assisted her in getting into. Mr. Nabit did not visit her while she was in the program.

Moreover, A.C.'s parents, concerned that she could not care for the child because of her involvement in prostitution and with drugs, filed a case in the Circuit Court for Anne Arundel County to obtain custody of the child. In the Petition, A.C.'s mother stated under oath:

> "the father of ... [the child] is unknown. My daughter ... had multiple sexual partners ... She stated that she didn't even have the names of some of her sexual partners. She has even admitted to accepting money in exchange for sex."

After an evidentiary hearing, a Circuit Court Magistrate found "father is unknown." A Circuit Court Consent Order, to which A.C. was a party, stated "The father of the child has never been identified." In addition, the child's birth certificate indicates that the child's father is unknown.

It is true that Mr. Nabit, because of his lengthy emotional attachment to A.C., who unfortunately never conquered her drug addiction and died, has voluntarily helped her family financially in connection with the child. Helping people is what Mr. Nabit does. He gives them $2,000 a month to help, but that is not because he is the father and has a legal duty to do so, but rather is another example of his generosity, and should not be used against him, as the Government is trying to do.[8]

---

[8] The Government included this erroneous allegation in its Memorandum, adding its imprimatur to it so that the media will repeat it in media coverage of the case. The purpose, to further humiliate Mr. Nabit and cause public

Mr. Nabit is also not the only man who gives money to A.C.'s parents for the child. Another man sent the grandparents $500 for a college fund for the child when A.C. died. That same man sends $100 to the grandparents for the child each year on the child's birthday. Is he the child's father?

At page 8 of the Government's Memorandum, the Government conflates text messages between K.M. and Mr. Nabit from two different days. The texts on each date relate to different subjects. The Government does this to create the misimpression that the second text was in response to the first.

On June 5, 2020, K.M. who was supposed to see Mr. Nabit that day, told him in a series of texts that she was not feeling well. He asked "Does that mean you're still not coming." The next day, June 6, in a totally unrelated series of texts, in which K.M. made multiple requests for money including for such things as cat food, Uber and her cell phone bill. In the text, he said he had already given her $240 that day and texted "You just keep asking and asking with no sense of how much you get" to which she responded in the text quoted by the Government: "You always treat me how you want because you have money."

The Government, in a very misleading manner, conflates the two days of texts to create a false impression that the June 6 statement by K.M. was in response to Mr. Nabit's June 5 question about whether she was still coming on June 5. It was not. One must ask, "Why would the Government make this mischaracterization except to paint Mr. Nabit in an inaccurate light."

---

humiliation and further distress to his wife and children. A Motion to Seal the reference to the allegation in the Government's Sentencing Memorandum has been filed. Of course, it should never have been in the Government's Memorandum in the first place.

It should also be noted, as the Government ignores, that Mr. Nabit often gave K.M. money in response to statements by her that she loved and cared about him, similar to the statement in an April 20, 2020 Cash App request from her for $20 – "love u bozo."

## SENTENCING VARIANCE

In the plea agreement, the Government "stipulated" to an adjusted offense level of 13, with which, following Mr. Nabit's Objections to the Presentence Report, the Probation Officer now concurs. The sentencing range for Level 13 is 12 to 18 months. Yet the Government is seeking a sentence of 36 months of incarceration twice the top end of the Level 13 sentencing range. Unfortunately it is clear from the Government's Sentencing Memorandum that it is trying to walk away from the Guidelines stipulation it entered into by asking for 36 months, essentially an upward departure.

Under the plea agreement the parties are each free to ask for a guideline variance, but the Government disingenuously argues out of the other side of its mouth that while its request for 36 months, two times the 18 month top end of the range for Level 13 is perfectly okay, that Mr. Nabit should not be permitted to ask for a variance, fully in line with the conduct at the heart of this case, the money he gave the sex workers, a sentence below the Mann Act Level 13 range.

This case is and has always been about the money Mr. Nabit gave the women, which is what he was originally charged with under 18 U.S.C. Section 1952(a)(3) and why the Government included it as relevant conduct in the Plea Agreement, emphasized it in the Statement of Facts and made it the sole focus of its Sentencing Memorandum. The Guidelines for that offense are base offense Level 6, with an adjusted offense level of 4, with a sentencing range of 0 to 6 months. That is, and always has been at the heart of this prosecution, and should be the variance applied by the Court in this case.

Although the offense of conviction is traveling with A.N. to Florida in July 2019, in violation of the Mann Act, 18 U.S.C. 2421, the Government ignored the offense of conviction in its Sentencing Memorandum. Instead, A.N. is only mentioned briefly in a single paragraph on Page 21.[9]

Under 18 U.S.C. § 3553(a) it is completely appropriate for the Court to take into consideration that Mr. Nabit was a customer and not a trafficker of sex workers, the psychological factors which caused him to become a customer and emotionally attached to prostitutes, the conduct of the street smart sex workers who knew what to say to Mr. Nabit to get money from him, that the money was given in response to frequent requests, and his decades of extraordinary community service. It is also appropriate for the Court to consider the extensive mental health treatment Mr. Nabit has engaged in for a year, from which he has become a different person. All of these factors apply in determining a just punishment in this case under 18. U.S.C. § 3553.

The fact is that the Government charged Mr. Nabit under the Mann Act to manipulate the Guidelines to obtain a sentence disproportionate to his conduct because the Mann Act base offense level is 14, not the level 6 associated with the money he gave the women. Yet, the trip Mr. Nabit took with A.N, treated by the Government as an afterthought in its Sentencing Memorandum, was not to traffic her and is out of the heartland of Mann Act cases and he should be sentenced accordingly.

**Government's Request for Restitution**

The Government has proffered the expert report of CPA Edith Wong and is seeking

---

[9] She is only mentioned so the Government can try to erroneously associate Mr. Nabit with Jeffrey Epstein. That association is wrong. Epstein sought out minors and true innocents, seduced them to accept sexual advances by him and other adult males, and then got the girls sexually involved with multiple other men. Mr. Nabit did none of that. Assuming that A.N. even volunteered the Epstein reference when the victim impact person spoke to her, A.N. was a professional prostitute who used the internet to obtain customers. She even made unsuccessful efforts to connect with Mr. Nabit after his arrest. Several are included in **Exhibit 3**. She had reason to try to hurt Mr. Nabit because he was no longer sending her the thousands of dollars she was getting from him prior to his arrest.

19

restitution in this case for Victims 1, R.H., 3, E.D. and 4, N.H. who are the subject of the relevant conduct under 18 U.S.C. § 1952. They are not involved in the offense of conviction.

As a matter of law, the Government's request for restitution for R.H., E.D., and N.H. is contrary to well-settled law. Cases in the Fourth Circuit and elsewhere clearly hold that restitution is only available to victims of the offense of conviction, which in this case would only apply to Victim 6, A.N. *See United State v. Freeman,* 741 F.3d 426, 434-35 (4th Cir. 2014); *United States v. Newsome,* 332 F.3d 328, 341 (4th Cir. 2003); *United States v. Blake,* 81 F.3d 498, 506 (1996); *Hughley v. United States,* 495 U.S. 411, 418 (1990). Restitution "must be based on the offense of conviction, not relevant conduct." *United State v. Thuma,* 382 F. Supp. 3d 166, 172 (D. P.R. 2019); *United States v. Anthony,* 942 F.3d 955, 964 (10th Cir. 2019).

The victim in connection with the offense of conviction is Victim 6, A.N. The Government has not proffered any expert reports or evidence which would support restitution for her, nor has it made a restitution claim on her behalf.

Respectfully submitted,

*/s/ Steven A. Allen*
Steven A. Allen (Federal Bar No. 00607)
sallen@pklaw.com
Aidan F. Smith (Federal Bar No. 29312)
asmith@pklaw.com
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 500
Towson, MD 21204
410-339-6779
410-832-5602 (fax)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of June, 2021, the foregoing was served upon counsel for the United States via electronic filing and email.

*/s/ Steven A. Allen*
Steven A. Allen (Federal Bar No. 00607)